MaddeN, Judge,
delivered the opinion of the court:
On December 6, 1948, the court entered judgment for the plaintiff in this suit for just compensation for the taking by the Government of the plaintiff’s dry-cargo freighter, the International. The judgment was based upon a sound condition value of $292,232.18 for the ship on the date of its taking, October 6, 1943. On June 13, 1949 the Supreme Court of the United States decided the case of United States v. Cors, 337 U. S. 325. The opinion of the Court in that case created a doubt in our minds as to whether, in the valuation which we had placed upon the International, there might have been included some amount of enhancement “due to the causes necessitating the taking,” which amount should have been excluded, pursuant to Section 902 (a) of the Merchant Marine Act of 1936, as amended, 46 U. S. C. 1242, as that statute was interpreted by the Supreme Court. We, therefore, remanded the case to a commissioner of this court for the purpose of taking evidence on the question of enhancement.
In 1939, before the outbreak of the Second World War, there was a great excess of tonnage of dry-cargo freighters in this country, and in the world. Prices were, consequently, low, averaging some $20 per deadweight ton. They remained so until January 1940, but thereafter they rose spectacularly, although with some temporary downward fluctuations, until June 1941 when the price was about $90 per ton. That was the peak of prices, and from that time they fell back to some $60 per ton in April 1942, after which time there was no free market for such ships.
The consideration that determines what a buyer is willing to give for a ship is the prospect, or lack of prospect, of profitable operation. That depends on the number of ships *762 available, and tbe amount of cargo available. If there are too many ships for the available cargo, there will be rate-cutting in competition for the business, and underloading. The outbreak of war in Europe in September 1939 gave, a prospect of an increase in shipping,- and ship prices tended, upward. This country passed its neutrality statute in' No-, vember 1939, barring American-flag ships from belligerent areas, and the prices went down. Operators of American-flag ships adjusted themselves to a new pattern of operation, outside the belligerent areas, and prices went up. But during the period from October 1939 to June 1941, the latter date being the time when prices reached their peak, the United States Maritime Commission permitted the sale to foreigners of some 165 American-flag dry-cargo ships because they were regarded as excess tonnage. As the fighting became more severe, many freighters were lost by sinking or destruction. Between September 1, 1939 and' December 31,1941,2,612 dry-cargo ships were lost by the nations who became our allies when we entered the war, and by neutrals. By mid-1941,- the' time when ship prices reached their peak, those losses already amounted to 1,775 ships more than had been replaced by new construction. To the grow-' ing scarcity of ships was added the fact that the effectiveness of operation was impaired by war conditions. Slow convoy movements, longer voyages, overstraining of machinery, changes in routing, inspection and certification in connection with blockades, all had adverse effects.
As more of the European countries became involved in the war in 1940, their merchant vessels were removed from commercial operation and from competition with American ships in trade'with South America, West, South, and East Africa, the Far East, the Netherlands East Indies, Malaya, and Australia. The business of American ships increased greatly in the trade with all these areas.
The general expansion of business in the United States from 1939 to 1941 increased the demand for and the earnings of freight ships. Pertinent statistics show that gross national product, consumption expenditures, and private investment, increased greatly in this period, and continued to increase throughout the war. Federal Government pur *763 chases of goods and services for war purposes also increased in this early period, but the amounts of these purchases were small in comparison with those relating to private business. The profits of all industries, including railroads and water transportation, increased greatly during this period.
Our problem is to determine how much, if any, of the increase in the price of ships which took place after the President’s declaration of a limited national emergency on September 8, 1939, 3 C. F. B. Cum. Supp. 114, and before the taking of the International on October 6, 1943, was deductible enhancement under the Merchant Marine Act of 1936. The prices of such ships reached their peak in June 1941, and tended downward after that date. The value which we have placed on the plaintiff’s ship was substantially lower than the market price of such ships .in June 1941. The decline in the price of ships after June 1941 was the result, and the intended result, of the passage of the Ship Warrants Act of July 14,1941,55 Stat. 591, which authorized the President to delegate to the Maritime Commission the power to exercise close control over American merchant ships with regard to the trades in which they should engage,' the voyages to be undertaken, the class of .cargo to be canned, the charter hire to be charged, and other things.- By making use of these-powers, the Maritime Commission stopped the rise in the price of ships, since.'owners could'no longer pick the most profitable routes or cargo, nor charge the high rates which they had been charging, and the prospects of large earnings no longer existed. Further, in April 1942, the War Shipping Administration ordered the requisition for use, though not for title, of practically the entire oceangoing merchant fleet of the United States. From that time until the requisition for title of the plaintiff’s ship in October 1943, there was, of course, no free market -for ships.
We return, then, to the question of how much deductible enhancement there may have been in the price of the International in June 1941, which enhancement may have remained in the lower value which we found that the plaintiff’s ship had on October 6, 1943. The Government does not claim that there was any enhancement in the value of the ship caused by the Government’s previous or prospective taking of ships of a similar type. .We have already discussed some of the causes for the rise in the value of mer *764 chant ships from 1939 to June 1941. We now consider the activities of the Government during this period, to see whether its activities contributed to the rise in the value of ships. In September 1939, the Maritime Commission had 109 dry-cargo ships in its laid-up fleet. By June 1941, all but 15 of these ships had been put back in use. Forty-seven of these ships were sold to foreigners and were thus made available for competition with American ships. The Maritime Commission, through its official construction program authorized by the Merchant Marine Act of 1936, caused to be built 68 new merchant ships. On June 6, 1941, Congress passed a statute, 55 Stat. 242, authorizing the purchase or requisition of any foreign merchant vessel lying idle within our jurisdiction. Six such ships were requisitioned during the first half of 1941.
All of the above-recited activities of the Government increased the number of available merchant ships and did not contribute to a rise in the prices of ships.
Between September 1939 and the end of April 1941, 50 ships were transferred by the Government from general commercial use to the Army and Navy. Of these, 24 were combination cargo and passenger ships, 22 were dry-cargo freighters and the other 4 were probably tankers. To whatever extent these ships did not, after their transfer to the Army and Navy, carry cargo that had formerly been carried by merchant ships, their transfer diminished the available supply of merchant ships.
There were activities of the Government in relation to cargo and shipping space which should be considered. Those activities were (a) transportation of military shipments in excess of the capacity of freighters directly under the control of the armed services; (b) importation for civilian account of commodities basic to the national economy in peace or in war, which commodities were designated by the Munitions Board as strategic, critical, or essential; (c) transportation of cargo in the Bed Sea lift under the Lend-Lease program; and (d) importation of commodities for Government account for stockpiling purposes.
As to item (a) above, the War Department estimated on February 21, 1941, that commercial freighters would need *765 to carry 1,095,070 tons of cargo for tbe Department to Panama, Hawaii, the Philippines, Alaska, and our Atlantic bases, in the first half of 1941, in addition to the tonnage of the ships directly under the control of the Department. After that estimate, more ships were, as we have seen above, transferred directly to the War Department. It is, therefore, impossible to determine accurately how much of this Army tonnage was carried by commercial ships.
As to (b) above, there was a substantial increase in the importation into the United States of basic commodities essential for defense or for the normal operation of the civilian economy. The Army and Navy Munitions Board listed and classified these commodities, but all purchases of them were made by civilian importers. The Maritime Commission was, however, assigned the task of assisting civilian importers of these commodities to find shipping space. During the September 1989 to 1941 period here in question, these imports were for the purpose of building up a civilian supply of materials for use in normal trade channels in the manufacture of goods for civilian use or for national defense or for export to countries which we were assisting. The Maritime Commission used strong tactics, described by witnesses as “jawboning” to induce or compel ship operators to carry some of this cargo, which the operators did not want to carry because of the availability of other higher revenue-producing cargo. In view of the general increase in the economic activity of the country during the period in question, it is not possible, on the evidence before us, to determine the extent to which the defense program of the United States or the intervention of the Maritime Commission to find shipping space for civilian importers, increased imports into the United States and thus increased the earnings and prices of ships.
Item (c) listed above, was exportations under Lend-Lease. The Lend-Lease Act, 55 Stat. 31, was not enacted until March 11, 1941, hence there was only a short period of activity under it before June 1941, the time when ship prices reached their peak. It appears from our finding 19 that only some 123,000 tons of cargo were exported under Lend-Lease during that short period. The carriage of this relatively *766 small amount of cargo would have had no substantial effect upon the market for ships.
Item (d) above was the importation of commodities for Government account for stockpiling purposes. Government corporations,. Eubber Eeserve Company, Metals Eeserve Company and Defense Supplies Corporation caused the importation and stockpiling of rubber, lead, wool, chromium, copper, manganese, tin, zinc, tungsten and tin and zinc ore. While the persons from whom they bought these supplies were contractually bound to find shipping space for them, ship operators were unwilling to carry these bulky commodities because of the availability of higher revenue-producing cargo, and it was necessary for the Government, through the Eeconstructiori Finance .Corporation and the Maritime Commission, to intervene with United States-flag- ships to get them to carry these commodities. This pressure did not, of course, affect favorably the value o.f the ships directly involved. But the carriage of this cargo for the Government used up some ship, space, and no doubt tended to increase the earnings and values of ships generally.
As we have said, the. Government, through the means of the Ship Warrants Act of July 14, 1941, supra, deliberately depressed the price and value of merchant ships by controlling their rates, routes, and types of cargo. Within less than a year, prices fell from $88.50 to $60 a ton. What prices in a free market would have been after April 1942 can only be estimated,, since in that month the Government requisitioned the use of practically all American-flag merchant ships, thus taking them off the market.
The value of $290,000 which we formerly fixed for the plaintiff’s ship and its equipment and spare parts was substantially the April 1942 market value, with some.addition because of the better-than-average condition of the ship. That value was, of course, much less than the peak value of such ships in June 1941. Ship values in June 1941 may have been enhanced somewhat by activities which might be regarded as covered by the statutory language “causes which necessitated the taking”. The importation of commodities for stockpiling by the Government, and the exportation of Lend-Lease supplies, might be regarded as such activities. *767 But the amounts of such cargo were small, in relation to the total shipping of the period; and the amount of the enhancement would have been small! Then.came the Government’s deliberate and successful effort to depress the price of ships. Prices fell much more than the amount of any possible enhancement which had theretofore taken place as a result of such activities. It is, of course, possible that, in spite of that fall, the depressed prices may still have contained .some small element of enhancement. But our best judgment is that after the severe, and artificially produced, reduction in .values which began in July 1941, no substantial amount of such enhancement survived.
We adhere to and reaffirm our former judgment.
It is so ordered.
WhitaeeR, Judge; LittletoN, Judge; and JoNes, Chief Judge,, concur.
ITNDINGS OE PACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Boald A. Hogenson, and the briefs and argument of counsel, as follows:
1. On December 6, 1948, the Court entered judgment for plaintiff in the sum of $112,985.93, plus interest as a part of just compensation. This judgment was predicated upon a finding that on October 6, 1943, the date of her requisition by the defendant, the fair and reasonable value of the plaintiff’s vessel International and all equipment and spare parts taken by the defendant was $290,000.00, of which $15,442.82 represented the value of equipment and spare parts taken in addition to those detailed in the original specifications. The Court found that at the time of requisition, the vessel was in need of repairs at the reasonable cost of $17,675.00. The sound condition value was $292,232.18, or $66.87 per dead-weight ton, exclusive of the extra parts and equipment. The Court further found that in September 1939 the International had a fair market value of $18.00 per dead-weight ton, which, on the basis of her 4,370 dead-weight tons, would amount to $78,600.00.
*768 2. From August 1989 to April 1942, the sound-condition market value per dead-weight ton, based on domestic sales to American buyers, of United States-flag oceangoing dry-cargo vessels, comparable to the International, varied from time to time as follows:

There were no free sales of comparable ships between April 1942 and the day of the title requisition of the International, October 6, 1943. The International was requisitioned by the defendant for use on June 6, 1942, and held by the defendant under charter requisition until its taking for title.
The decline in market values after June 1941 was caused by the passage of the Ship Warrants Act of July 14,1941, and the consequent and immediate reduction of freight rates and imposition of other controls by the Maritime Commission.
The Maritime Commission pursued a policy of delaying the requisition of vessels, as outlined in the following passage from the formal statement made on June 10, 1943, by its Chairman to the Committee on the Merchant Marine and Fisheries, House of Representatives, Seventy-eighth Congress, First Session:
However, even if the Maritime Commission had the power to requisition before May of 1941, the exercise of that power during the high market conditions of late 1940 and early 1941 would have been most unwise and unfortunate, since the owners would then have been in a position to file suit in the Court of Claims for the full market values of that peak period. The results of such premature requisitioning would therefore have been very costly to the United States. The only sound strategy was to delay the date of requisitioning as we did until rates and values could be reduced to more moderate levels.
Under the circumstances, the Maritime Commission determined not to resort to requisition, even after May 27, 1941, but to continue operations under private own *769 ership until such time as its efforts to reduce and stabilize rates and values should produce results or the need for requisitioning should become clearer and more pressing.
In April 1942 the War Shipping Administration ordered the requisition for use of practically the entire oceangoing merchant fleet of the United States.
3. Significant military events transpired during the period of the increases and decreases, as shown in Finding 2, in the domestic market values of United States-flag vessels comparable to the International. After the outbreak of war in Europe upon the German invasion of Poland in September 1939, American ship values increased through October 1939 until the passage of the Neutrality Act in November 1939. At that time, United States-flag vessels were barred from operations to and from the United Kingdom, the Baltic Sea and Bayonne-Hamburg range. There followed a moderate decline of vessel values through December 1939. Through early 1940 and until April 1940, ship values increased sharply, although the war in Europe had no significant developments.
From April to July 1940, there followed in order the German invasion and conquest of Denmark and Norway, then of the Netherlands and Belgium, with the British withdrawal from the European mainland at Dunkerque, and finally the fall of France in June 1940. During this period and until August 1940, there was a temporary world oversupply of vessels, and American ship values declined. Italy entered the war in July 1940, and American vessels were thereafter barred from operations in the Mediterranean and Black Sea areas.
United States-flag ship prices increased at first slowly from August 1940 to January 1941, and then sharply until the peak in values was reached in June 1941. Upon the passage of the Ship Warrants Act, domestic vessel values declined until the last sales in a free market were made in April 1942. In the meantime, the United States in December 1941, had formally entered the war against Germany, Italy, and Japan.
4. No evidence was offered or presented in this case for the purpose of showing the extent to which any enhancement in *770 the value of the International was caused by the defendant’s previous or prospective taking of vessels of a similar type.
5. The free market value of dry-cargo vessels, like that of other income-producing properties, is determined primarily by what sellers and buyers estimate the immediate net earning prospects of such vessels to be.
During the period 1939 to 1941, there was a considerable increase in the earnings of United States-flag ships. A study of 29 representative United States shipping companies which, from the standpoint of number of ships owned, ship sailings, and capital investment, were most of the principal United States shipping companies, discloses the following facts:
a. Gross revenues increased from approximately $258,000,-000 in 1939 to approximately $530,000,000 in 1941, or an increase of more than 100 percent;
b. Gross profits from operation (without subsidy) increased from $56,000,000 in 1939 to approximately $187,000,-000 in 1941, more than a threefold increase;
c. Net profits before Federal income taxes increased from $24,000,000 in 1939 to approximately $149,000,000 in 1941, more than a sixfold increase.
Freighter earnings and values are primarily determined in a free market by the supply of and the demand for vessels for ocean transportation.
6. Prior to the outbreak of the war in Europe in September 1939, the world, as well as the United States Merchant Marine, was over-tonnaged as to freighters. Vessels were laid up all over the world. The gross tonnage of active United States-flag freighters as of June 30,1939, was 3,912,-000 tons; the gross tonnage of the laidup United States-flag freighters on the same date was 1,512,000 tons, of which 742,-000 tons were privately owned and 770,000 were Government-owned. Ships actually in operation were traveling on the average about one-third light. This over-tonnaged condition was reflected in low sales prices.
As of September 30, 1939, there were 832 United States-flag dry-cargo vessels in existence, each of 1,000 or more gross tons. The following table shows the cumulative figures, in each quarter of the calendar year, as to the distribution of *771 such vessels in the laid up fleet, the domestic trades, the foreign trades, sales foreign, and other dispositions thereof:

7. A substantial factor which affected the supply of freighters was the sinking and destruction of tonnage resulting from the war in Europe. At the outbreak of the war in September 1939 the world supply of freighters totaled 8,232 ships having a total registered gross tonnage of 30,589,084. Thereafter, the actual monthly losses of freighters exceeded new construction until July 1942, causing a steady and substantial decrease in the total world supply of freighters. Foreign-flag ships were actually disappearing from the high seas so that they could not be put to any use, whether for war or commercial purposes. This persistent contraction in the world’s supply of freighters during this period had the effect of increasing the value of those freighters remaining in existence.
On the allied and neutral side, from September 1, 1939, through December 31, 1941, there was a total loss of 2,612 dry-cargo ships aggregating 8,640,489 gross tons. This represented a net loss, over and above new construction, of 2,178 dry-cargo ships totaling 5,943,160 gross tons; numerically, this was a net loss of about 80 percent of the total allied and neutral merchant dry-cargo fleets as they existed on September 1,' 1939. No United States-flag dry-cargo vessels were lost until December 1941. At the peak of prices of United States-flag dry-cargo oceangoing ship prices in mid-1941, the allied and neutral net losses had reached 1,775 dry-cargo vessels, aggregating 5,329,097 gross tons.
8. Another factor which affected the supply of freighters was their decreased effectiveness because of war conditions. *772 The effective world supply of freighters was decreased by war damage and other war conditions which resulted in more frequent and prolonged layups for repairs, slow convoy movements, longer voyages, overstraining of machinery, frequent changes in trade services as well as in routing, congestion and other difficulties and delays in loading and unloading, wartime red tape, inspection and certification in connection with blockades, all of which factors contributed to lower efficiency. All of these conditions combined to cause, in effect, a decrease in available world supply of cargo space.
9. Between October 26,1939, and mid-1941, when the peak of ship prices in the American market was reached, the supply of privately owned American-flag freighters was reduced by the sale to foreigners of approximately 165 United States-flag dry-cargo ships of over 2,000 gross tons each, with a total gross tonnage of about 851,730 tons. Of these 165 ships, 81 were sold to allied belligerents and 84 were sold to neutrals, including some sales to Spanish and Italian nationals. Sales of American-flag vessels to alien buyers were forbidden by Section 9 of the Shipping Act, 1916, unless approved by the United States Maritime Commission (46 U. S. C. Sec. 808). These sales were permitted by the Commission because it was deemed desirable to get rid of “excess” tonnage.
10. During the period from September 1939 to the middle of 1941, when the peak of freighter prices in the domestic market was reached, the supply of freighters for commercial ocean transportation to areas outside the combat zone was substantially decreased by a progressive withdrawal of belligerent-flag freighters from commercial competition with American-flag freighters. This was due to the fact that as time went on, more of the European countries became involved in the war and their merchant fleets were required for war purposes. By the fall of 1940 about 75 percent of the total world dry-cargo tonnage as it existed on September 1,1939, was no longer neutral tonnage to be employed freely in normal commercial operations,, and of the remaining neutral dry-cargo tonnage, approximately one-half was under United States flag.
*773 Prior to September 1939 not more than one-third of the vessels trading between the United States and South and East Africa were American. By February 25, 1941, the number of sailings in that trade had almost doubled and more than 90 percent of the vessels were American. At the same time, due to constant withdrawal of British ships from the United States trade with India, the American lines were enabled to double and triple their services. With respect to the trades with the Far East, Netherlands East Indies, and Malaya, most of the British and a large number of other foreign vessels had been withdrawn, and American lines were enabled to double and quadruple their sailings.
Upon the passage of the Neutrality Act in November 1939, United States-flag vessels were barred from trade to and from the United Kingdom and the Baltic and Bayonne-Hamburg areas, and in July 1940, to and from the Mediterranean and Black Sea areas. Most of the United States-flag vessels barred from their regular services to European and Mediterranean ports found employment in substitution for foreign-flag tonnage withdrawn from other services in addition to the above, such as to South America, West Africa, and Australia.
The following table on freighters carrying cargo on non-domestic voyages through the Panama Canal during the first quarters of the years 1939,1940, and 1941 demonstrates the progressive decline which war conditions in Europe caused in foreign-flag freighter competition with United States-flag freighters.
NUMBER OE FREIGHTER TRANSITS, PANAMA CANAL
[Excludes all United States intercoastal and local transits]

*774 The withdrawal of foreign-flag ships from commercial trades substantially increased the earnings and values of United States-flag dry-cargo ships.
11. One of the factors which affected the demand for and earnings of freighters during the period 1939-1941 was the greatly increased improvement in business generally. Following the substantial recession in the fall of 1937 there was some recovery in the first half of 1938, but by early 1939, the factors responsible for recovery had spent their expansive powers, and thereafter until September 1939, the economy of the United States was operating on an even keel, with no dynamic factors present. The outbreak of war in Europe caused a marked expansion which was reflected in all the major business indicators, especially in the increase of business inventories. In early 1940 there was a. general and gradual decrease in economic activity, concurrent with the lack of developments in the war in Europe. Following the German invasion of the Scandinavian countries on April 6, 1940, this decline was promptly halted, and thereafter the economic activity of the United States expanded tremendously throughout the rest of the war, and in particular throughout the rest of 1940 and all of 1941.
This improvement' is reflected in the gross national product or expenditures figures for 1939, 1940, and 1941. Personal consumption expenditures increased from 67.5 billion dollars in 1939 to 72.1 billion dollars in 1940 and to 82.3 billion dollars in 1941, while the gross private domestic investment jumped from 9.9 billion dollars in 1939 to 13.9 billion dollars in 1940, and to 18.3 billion dollars in 1941. This increase of 23.2 billion dollars in these two items alone compares with a total increase between 1939 and 1941 of 35.1 billion dollars in the total gross national product or expenditures, the total figures for the latter being 91.3 billion dollars in 1939,101.4 billion dollars in 1940 and 126.4 billion dollars in 1941. During this period of time the Federal Government purchases of goods and services for war purposes increased from 1.3 billion dollars in 1939 to 2.2 billion dollars in 1940, to 13.8 billion in 1941, 9.2 billion of which last amount occurred in the second half of 1941.
*775 This economic improvement led to increased earnings for all types of business, especially for the transportation industry, of which, shipping is an integral part, because that industry tends to benefit more sharply and suffers more severely from the rise and fall of the business cycle than do most types of business.
That all industries, including transportation, benefited from the widespread improvement in business conditions is demonstrated by the fact that corporate profits before taxes of all industries rose from $6,467,000,000 in 1939 to $9,325,-000,000 in 1940, and to $17,232,000,000 in 1941, while the corporate profits before taxes of the transportation industries as a whole rose from $160,000,000 in 1939, to $332,000,-000 in 1940, to $910,000,000 in 1941. .The corporate profits before taxes of all water transportation rose from $50,000,000 in 1939, to $90,000,000 in 1940, and to $157,000,000 in 1941, while the corporate profits before taxes of all railroads rose from a loss of $12,000,000 in 1939 to a profit of $80,000,000 in 1940, and to a profit of $517,000,000 in 1941.
12. Demonstrative of the greatly increased demand for and the resulting increase in values of United States-flag' freighters during the period 1939-1941 was the great increase in the volume of their carryings in the foreign trade of the United States.
The total ocean freighter carryings (all flags) of the dry-cargo export and import traffic in long tons in the foreign trade of the United States increased from 49.2 million tons' in 1939 to 51 million tons in 1940, and declined for the year 1941 to 49.8 million tons.
The proportion of the traffic (United States dry-cargo exports and imports in foreign trade) carried on freighters flying the United States flag increased sharply, rising from a total of 11.9 million tons in 1939, to 16 million tons in 1940, to 21.1 million tons in 1941. At the same time foreign-flag carryings declined from 37.3 million tons in 1939,. to 35: million tons in 1940, to 28.7 million tons in 1941. Of the total carryings in the United States foreign trade, United States flags increased in proportionate tonnage from 24.2 percent in 1939, to 31.4 percent in 1940, to 42 percent in 1941, *776 while foreign-flag carryings declined from 75.8 percent in 1939 to 68.6 percent in 1940, to 58 percent in 1941.
The increased carryings of United States-flag freighters did not include munitions of war or other traffic to or from the combat zones in Europe because the Neutrality Act excluded vessels under the United States flag from the United Kingdom and Baltic Sea and Bayonne-Ilamburg areas commencing in November 1939, and from the Mediterranean and Black Sea areas, commencing in July 1940. By far the greater portion of such increased carryings was to and from overseas areas in the Caribbean, South America, South, East and West Africa, Australasia, India, Persian Gulf, Bed Sea, Straits Settlements, Netherlands East Indies, South China and the Philippine Islands. The traffic with these areas and the share of such traffic carried on United States-flag freighters increased sharply because of vast rearrangements which the war in Europe caused in the pattern of international trade and in the pattern and extent of competition between United States-flag freighters and foreign-flag freighters. As Europe was cut off as a source of supply for manufactured goods, and as a market for raw materials, the trade of the remainder of the world in general tended to flow to and from the United States.
13. A further factor which affected the earnings of freighters during the period 1939-1941 was the greatly increased utilization of freighter space. Such increase was evidenced by the fact that even though the net registered tonnage of ships entering and clearing in the foreign trade fell from about 91 million tons in 1939 to about 62 million tons in 1941, approximately the same amount of cargo tonnage was carried in 1941 as in 1939.
The increased cargo carryings of United States-flag freighters in 1940 and 1941 resulted in greatly increased profits because of the fact that in merchant shipping, as in railroad transportation, greater utilization of carrying space produces increased revenues without a proportionate increase in costs.
14. Other factors which affected the earnings and values of freighters during the period 1939-1941 were (a) more *777 valuable cargoes were carried, (b) competitive practices decreased, and (c) shipping rates increased.
(a) The character of the cargoes carried became increasingly more valuable, and, therefore, more profitable. The average value of United States imports and exports per long ton increased from $58.51 in 1939 to $72.53 in 1940, an increase of 24 percent in one year. In 1941, the average value per long ton rose to $83.70, 15 percent above 1940. Such a rise tended to increase vessel earnings and values, because the more valuable the cargo, the better the applicable freight rates, and, therefore, the better the ship’s earnings. At the same time that cargoes were increasing in value, the total ship tons (100 cubic feet) of vessel cargo space entering and clearing in the United States foreign trade were declining from 115,355,925 in 1939, to 93,410,028 in 1940, and to 88,505,-987 in 1941, so that the value of cargo per ship-ton rose from $40.45 in 1939 to $58.98 in 1940 (46% over 1939), and further rose to $78.48 in 1941 (33% over 1940).
(b) The elimination of competition through the progressive disappearance of belligerent foreign-flag ships theretofore engaged in the commercial trades not only enabled United States-flag vessels to obtain better paying cargoes in both directions, but also reduced competitive practices such as rate cutting, which, in turn, led to increased earnings.
(c) Although operating costs increased somewhat during the period, there was a substantial increase in freight and charter rates from the abnormally low levels in effect in September 1939, until the passage of the Ship Warrants Act in July 1941. Shipping rates started to climb immediately following the outbreak of the war in Europe. Liner rates increased throughout the period to July 1941. From April 1940 to July 1940 tramp rates declined, but resumed their upward trend thereafter. Practically all of the United States-flag vessels in operation during this period were in liner operations and were not free to tramp from one trade area to another.
Substantially more than fifty percent of the increase in liner rates occurred prior to July 1940.
15. The activities of the Government in the particular market for the purchase and sale of ships during the period *778 1939-1941, as shown-by the limited evidence in this record pertaining thereto, were comparatively negligible, and the effect thereof on the values and prices of ships is not susceptible of even an approximate measurement. The net effect of these activities was to increase the supply of ships, and therefore tended to depress the values instead of to enhance the values of American-flag freighters.
The activities of the Government in the particular market for freighters themselves consisted of the following:
(a) At the outbreak of the war in Europe in September 1939 there were 109 dry-cargo ships in the United States Maritime Commission’s laidup fleet. Between that date and mid-1941, when the peak of ship prices in the American market was reached, the laidup fleet had been reduced to 15 freighters. The reactivating of ships from the laidup fleet served to increase the world supply of active freighters, and therefore could not have had an enhancing effect on earnings and values of American-flag freighters.
(b) The reduction in the Maritime Commission’s laidup fleet between September 1939 and mid-1941 was due in part to the Commission’s sale to foreigners of 47 freighters of over 2,000 gross tons each, with a total gross tonnage of approximately 280,428 tons. Of these 47 dry-cargo ships, 35 were sold in the last quarter of 1940 and 12 in the first quarter of 1941. The sale of these ships tended to increase competition and to decrease the earnings and values of active American-flag freighters. .
(c) In addition to the 47 freighters removed from the Government’s, laidup fleet and sold foreign, a group of 27 freighters was removed from the -laidup fleet during 1940 and 1941 and chartered to domestic operators. ■ The charter parties on 25 of the-27 vessels were executed prior to July 1941. The charter of these 27 freighters from the laidup fleet served to increase the domestic supply of active dry-cargo space, and to that extent tended to decrease earnings and values of other American-flag freighters then in active service.
(d) Erom September 1,1939, through December 31,1941, the size of the American-flag freighter fleet was increased due to the fact that during this period 95 freighters and *779 16 combination cargo and passenger vessels, totaling about •one million dead-weight tons, were completed and delivered under the Maritime Commission’s official construction program instituted pursuant to the Merchant Marine Act, 1936. Of the 95 freighters, 10 were completed in the last four months of 1939,30 during 1940,28 during the first six months •of 1941, and 27 during the last six months of 1941.
These figures do not include 9 freighters totaling 89,385 •dead-weight tons, which were privately constructed under non-Maritime contracts and delivered as follows: 3 in 1940, 4 during the first six months and 2 during the last six months of 1941. Nor do these figures include 5 British Liberty ships which were constructed in this country during 1941, the first of these ships having been completed in October of that year.
This activity of the' Government served to increase the •domestic supply of ships and, hence, served to decrease the earnings and values of the other American-flag freighters then in active service.
(e) On June 6, 1941, Public Law 101 (55 Stat. 242) was passed. That law authorized the purchase or requisition of any foreign merchant vessel lying idle within the jurisdiction of the United States, Philippine Islands, and the Canal Zone. On June 16,1941, the United States took title and possession of 6 Danish ships, and an additional 84 foreign-flag ships were requisitioned in United States waters during the second half of 1941.
This action by the Government also served to increase the domestic supply of ships and, hence, served to decrease the earnings and values of other existing American-flag ships.
(f) The only activity of the Government in the particular market for the purchase and sale of freighters which tended to decrease the supply of American-flag freighters, and thus to increase earnings and values of other American-flag freighters was the transfer of 132 American-flag vessels to the Army and Navy.
Of the 132, 50 vessels were transferred between September 1, 1939, and the end of April 1941, of which 24 (totaling 181,500 dead-weight tons) were combination cargo and passenger vessels, and 22 (totaling 217,500 dead-weight tons) *780 were dry-cargo ships, and the remainder probably tankers. The 22 dry-cargo vessels had all been constructed by the Maritime Commission pursuant to the Merchant Marine Act of 1936, within a period of two to three years prior to their transfer to the Army and Navy, sold to private owners, and repurchased by the Government.
Of the 132, 82 vessels were transferred between April 1941 and October 15, 1941. These 82 ships were of all types of oceangoing vessels, tankers, freighters, and passenger ships. Sixty of the 82 vessels were of new construction under the Maritime Commission contracts.
It is reasonable to conclude that except for the 60 newly constructed vessels and the 22 recently constructed, the balance of the 132 vessels came from the Government’s laidup fleet and the requisitioning of idle foreign ships.
16. To the extent that activities of the Government in the market for dry-cargo ocean transportation by freighters during the period 1939 to mid-1941, as distinguished from activities in the particular market for the purchase and sale or charter requisition of ships may be relevant in this case, such activities concerned:
(a) Transportation of military shipments in excess of the capacity of freighters already under control of the armed services;
(b) Importation for civilian account of commodities basic to the national economy in peace or in war, which commodities were designated by the Munitions Board as strategic, critical, or essential;
(c) Transportation of cargo in the Red Sea lift under the Lend-Lease program; and
(d) Importation of commodities for Government account for stockpiling purposes.
17. Following the fall of France in June 1940, the National Guard was mustered into service in August 1940, the Selective Training and Service Act was enacted in September 1940, and by July 1941, Army manpower increased from 250,000 to 1,500,000, and the Army’s procurement program by the latter date was in terms of a force of 3,000,000 men. This record does not disclose the increase in the Navy manpower during the same period.
*781 During this time, there was an expansion and reinforcement of military, naval and air bases, including Hawaii, the Philippines, the Panama Canal, Alaska, and the bases in the Atlantic and Caribbean obtained from the United Kingdom for the 50 United States destroyers transferred in the fall of 1940. These developments caused extensive shipments of materials, whether on Government-owned or private freighters, from the continental United States.
On March 10, 1941, the Secretary of War transmitted to the Maritime Commission official estimates dated February 25, 1941, of the tonnage requirements of the War Department for shipments from the United States to Panama, Hawaii, the Philippines, Alaska, and the Atlantic bases. It was indicated that over and above War Department freighters then available to transport 378,000 tons, the War Department would need up to July 1, 1941, about 32 freighters of 10,000 tons capacity each, to carry on about 109 voyages, 1,095,070 additional tons of cargo. Of that tonnage of estimated additional cargo to be moved, 889,070 tons would fall within the category of exports in United States foreign trade.
There is no direct proof by way of records produced that that amount of additional cargo moved for the War Department, but it is reasonable to conclude that a substantial amount thereof did.
The Secretary of War also estimated that in the fiscal year immediately following the peak in ship values reached in June 1941, the War Department would require in addition to its transports then available (February 25, 1941) to carry 1,050,000 tons, about 26 additional vessels (10,000 tons capacity each) to carry on 309 voyages 3,113,059 additional tons of cargo, of which 2,555,059 would fall within the category of United States foreign trade.
Assuming that one-half of the estimated additional tonnage requirements of the War Department for the fiscal year 1942 applied to the first six months of that fiscal year, then 1,277,529 additional tons were to be moved in the foreign trade in the second half of the calendar year 1941.
In this way, the defendant reaches the estimate that the War Department’s requirements for additional shipping *782 space in the foreign trade, over and above that which was available to the War Department on February 25,1941, was for cargo movements of 889,070 tons to July 1, 1941, and 1,277,529 tons to December 31, 1941, or a total of 2,166,599 tons.
There is no reliable evidence as to the extent of the Navy requirements for shipping space, over and above its avail-, able tonnage.
Considering the fact that between February 25, 1941, and October 25,1941, a substantial number of vessels were transferred to the armed services, as set forth in Finding 15 (f), and that to a very considerable extent the War Department’s estimated.need on February 25, 1941, for additional vessels was thereby satisfied, and the further fact that the above figures are merely estimated requirements, with no records in evidence to show what the actual carryings were on private freighters, whether foreign or domestic, it is impossible to reach any. reasonable estimate as to the extent to which these estimated requirements utilized United States-flag vessels owned by American operators, and thereby enhanced United States-flag ship earnings and values.
18. During the years 1939, 1940, .and 1941, there was a substantial increase in the import in United States foreign trade of basic commodities essential to the nation in defense or war programs and fundamentally necessary to the normal operation of the civilian economy. .
From the standpoint of military planning, the Army and-Navy Munitions Board had listed and classified such basic commodities as strategic, critical, and essential. Strategic materials were defined as those essential to the national defense, for the supply of which in war dependence must be placed in whole or in part on sources outside the continental limits of the United States, and for which strict conservation and distribution control measures would be necessary. Critical materials are those essential to the national defense, the procurement problems of which in war, while difficult, are less serious than those of strategic materials because they can be either domestically produced or obtained in more adequate quantities or have a lesser degree of essentiality, and for which some degree of conservation and distribution con *783 trol would be necessary. Materials neither strategic nor critical were those essential to the national defense, for which no procurement problems in war are anticipated, but whose status is such as to require constant surveillance because future developments may .necessitate reclassification as strategic or critical.
■ The Munitions Board made no purchases of such materials, but the Maritime Commission was assigned to the task of assisting civilian importers of such materials to find shipping space.
Except for the program of import of stockpiled materials hereinafter described, all import of basic materials was for civilian account, and no funds were spent by the Government either on the purchase price or to pay freight rates thereon. Between September 1939 and mid-1941, the increased imports constituted a building up of civilian supply for purchase and use through normal trade channels in the ultimate manufacture of consumers durable goods for domestic consumption or export, producers durable goods for domestic use or export, and the manufacture of war materiel both for the national defense and for export to such countries as the United Kingdom and France.
The import of basic materials in long.tons in the foreign trade of the United States increased from 7.4 million tons in 1939, to 9.3 million tons in 1940, to 11.4 million tons in 1941. Of these total imports, United States-flag carryings increased from 2.5 million tons in 1939 to 4.66 million tons in 1940, to. 7.3 million tons in 1941, while foreign flags decreased from 4.9 million tons in 1939, to 4.64 million tons in 1940,. to 4.1 million tons in 1941.
In order to afford some detailed consideration of the increases in the period from September 1939 to mid-1941, the imports in long tons by quarter years are set forth in the following table:

*784 These imported basic commodities were hides, skins, tung oil, palm oil, flaxseed, raw rubber, dye tanning material, raw silk, wool, textile fibers, bags and bagging, cork and waste, iron ore, manganese ore, chrome ore, ferromanganese, bauxite, copper, ilmenite, lead, tin, zinc, antimony, and sodium nitrate.
Civilian suppliers to some considerable extent (described only in generalities in this record) resorted to the Maritime Commission to find space for the import of basic commodities. The Commission did lay a heavy hand upon some United States-flag ship owners and operators and persuaded (or “jawboned” as the term is used in the testimony of several witnesses called by both the plaintiff and the defendant) them to afford shipping space for import of basic commodities. It is not shown the extent to which such intervention by the Maritime Commission actually or approximately increased the imports. The reluctance of the ship operators to carry basic commodities was because of the availability of higher revenue-producing cargoes.
The extent to which consumption of such commodities up to mid-1941 resulted from defense appropriations and letting of Government contracts for manufacture of war materiel cannot be determined with any degree of reasonable approximation. Civilian production increased without Government curtailment through the peak in ship values in June 1941. There is no showing of the extent to which any of the basic commodities was produced domestically, or imported other than in the oceanborne foreign trade of the United States. It is impossible to reach a determination from this record of the extent to which the defense program of the United States, or the intervention of the Maritime Commission to find space for civilian importers, increased the imports of basic materials and thereby increased earnings and values of United States-flag freighters.
19. Following the outbreak of war in Europe in September 1939, Great Britain and France set up purchasing missions in the United States to obtain supplies of war materiel and other goods essential to the prosecution of their war pro *785 grams. After the fall of France, the British Purchasing Mission assumed the French commitments. In recognition that Britain was without sufficient purchasing power to sustain this program, the President requested Congress in December 1940 to enact legislation to finance aid to Britain and her allies. Such legislation was enacted and approved op March 11,1941, as the so-called Lend-Lease Act (55 Stat. 31). Its stated purpose was to promote the defense of the United States by giving aid to those countries whose defense' the President deemed vital ;to the defense of the United States, the terms and conditions upon which any foreign government received any of such aid to be those which the President deemed satisfactory, the benefit to the United States to be payment or repayment in kind or property, or any other direct or indirect benefit which- the President deemed satisfactory.
Immediately following the passage of the Lend-Lease Act, the Maritime Commission was charged with responsibility of obtaining tonnage to carry Lend-Lease shipments.
During the months of May through December 1941, Government Lend-Lease cargo was loaded by the United States, or its agents, and transported on American-flag freighters from the continental United States to the Bed Sea where it was discharged and received by the British.
Although the charter agreements were executed between • the ship owners and the British Ministry of War Transport, the British left negotiations as to the ships, rates, and terms entirely to the United States Maritime Commission. The Maritime Commission negotiated charters with American operators for various United States-flag dry-cargo vessels. The number of vessels involved has not been proved. Payments for the charter use of the vessels were made directly to the ship-owners by the Maritime Commission from funds allocated for that purpose from Lend-Lease appropriations.
Based upon the records of the Maritime Commission of the loadings and sailings of dry-cargo vessels chartered for the Red Sea lift carryings of Lend-Lease shipments to the *786 British, the following table sets forth the number of sailings of ships and the cargo carried in the months of May through December 1941:

From the foregoing table it is computed that 123,530 tons of dry cargo moved on 36 sailings during May and June 1941, that is, by the time the price of United States-flag freighters had reached its peak. Thereafter, 414,449 tons of cargo moved on 81 sailings during the second half of 1941.
In addition to the Lend-Lease shipments to the British, Government cargoes under the Lend-Lease program moved in the second half of 1941 from the United States to Kangoon, India, for delivery over the Burma Koad to China in the approximate amount of 100,000 tons. This cargo was booked by the Maritime Commission on regular United States-flag liner services and moved in less than full-cargo lots.
Commencing in October 1941 and continuing through December 1941, Government LendrLease cargoes in the approximate amount of 55,000 tons moved to Murmansk, Kussia. Most of the vessels involved in this movement came from-the Government reserve fleet, and were transferred to the Panamanian flag to avoid the problems of the Neutrality Act, and chartered to private owners for the specific purpose of the Kussian operation.
20. By an Act approved June 25, 1940 (54 Stat. 572), the Keconstruction Finance Corporation was authorized to create subsidiary corporations to acquire stockpiles of strategic and critical commodities for the national defense program. Pursuant to this statute, Kubber Keserve Company and Metals Keserve Company were organized on June 28, 1940, and the Defense Supplies Corporation on August 29, 1940. These three corporations engaged in such stockpile purchases.
*787 ' Commencing in July 1940 and through. Junte 1941, when the peak in prices of United States-flag freighters was reached, stockpile imports in long tons for the account of these Government corporations were made as follows:

After June 30, 1941, and. through. December 1941, the stockpile imports in long tons for the account of the Government corporations were as follows:

' The quarterly figures in the foregoing tables represent the volume of import tonnage of strategic and critical commodities actually paid for by the Government corporations in the quarter years. Many of these imports were paid for on a delivered basis, but a substantial part was paid for on documents airmailed from the shipper when the cargo was still at sea on the import voyage, which lasted on the average of six weeks or less. To some extent, there was a lag between the times when payment was made and when actual import was accomplished.
Of the imports set forth in the foregoing tables, 6,585-long tons of copper, 62,617 long tons of lead, and 58,394 long tons of zinc ore were imported from Mexico, and 61,170 *788 long tons of lead from Canada. Whether these occurred before or after mid-1941 is not shown in the record. They were probably carried by railroad rather than by ocean transportation.
With respect to the rubber purchases, about 70 percent was purchased through New York importers, and about 30 percent directly from suppliers in the Far East. Prior to June 23, 1941, the contractual obligation was on the seller to provide shipping space. . The Rubber Reserve Company and the Reconstruction Finance Corporation frequently intervened in the shipping market prior to June 23, 1941, to assist in arranging shipping space because, they were primarily interested in obtaining rubber rather than redress for nonperformance of contract.
Both the Reconstruction Finance Corporation and the Maritime Commission intervened' in the shipping market to arrange shipping space for the import of Government stockpile commodities. There is no evidence from which it can be determined mathematically the tonnage that moved as a result of such intervention. Ship operators were reluctant to carry these commodities because of the availability of higher revenue-producing cargoes.. Government intervention was, of course, effective only as against .United States-flag freighters. It is reasonable to conclude that a.substantial part of the total stockpile imports moved by United States-flag vessels as a result of the direct, intervention by these Government agencies. While revenues of the particular ships would not be increased by the. substitution of lower revenue-producing cargoes, the utilization of ship space for such purposes tended to decrease the supply of and increase the demand for the remaining ships, and, therefore, to increase to some extent the earnings and values of United States-flag ships generally, up to the peak in values of such vessels in June 1941.
21. The enhancement in value of ^¿International was not due to any previous or prospective takings by the defendant of vessels of a similar type.
None of the enhancement resulted from the defendant’s shipment of war materiel and supplies to overseas bases, or from any intervention by the defendant in the shipping *789 market in behalf of civilian importers for importation of basic materials.
With respect to the transportation of Government cargoes in the Red Sea lift and the import of stockpile commodities for the account of Government corporations, it is reasonable to conclude that the defendant’s need for shipping space comparable to that of the International, and its intervention in the shipping market to satisfy that need, enhanced the value of the International before July, 1941, by some small amount which is not here determined.
This enhancement in value caused by the defendant’s intervention in the shipping market for shipping space was more than' offset by the reduction of rates, earnings, and values of the United States freighters, in the administration of. the Ship Warrants Act by the Maritime Commission.
■ No part of the defendant’s enhancement of the value of the International to mid-1941 is reflected in the value, heretofore found by the Court, of $66.87 per deadweight ton as of the date of her taking by the defendant for title, October 6,1943.' . ,
The opinion of December 6, 1948, by Judge Madden, referred to in the above opinion and reaffirmed, and not heretofore published, is given below:
SMITH-DOUGLASS COMPANY, INC. v. THE UNITED STATES
[No. 46289. Decided December 6,1948.]
Mr. Charles B. Mclnnis and Mr. Harold A. Hertz for the plaintiff.
Mr. John B. Miller, with whom was Mr. Assistant Attorney General H. G. Morison, for the defendant.
In this case- (No. 46289) the court on December 6, 1948, made findings of fact upon the report of Commissioner Raymond T. Nagle as follows:
1. Plaintiff is a corporation duly organized and existing under and by virtue of the laws of the State of Virginia, with its principal place of business at Norfolk, Virginia.
*790 2. On and prior to October 6,1948, plaintiff was the owner of the vessel International, formerly called Lake Singara. On that day. the War Shipping Administration, pursuant to the authority contained in Section 902 (a), of the Merchant Marine Act of 1936, as amended [53 Stat. 1254], and Executive Order -9054 of February 7, 1941, requisitioned title to and possession of the vessel and took delivery thereof, together with all spare parts and expendable equipment.
On July 28, 1944, the War Shipping Administrator determined just compensation for the vessel,, including its spare parts and equipment, to be $236,018.78 and offered that amount to plaintiff. On October 7, 1944, plaintiff rejected the offer. On November 20, 1944, the defendant paid the sum of $177,014.07 to plaintiff which represented 75 percent of the amount so. determined by the Administrator. This plaintiff accepted, reserving the right to sue the defendant for such further sum as would, in its opinion, make up just compensation for the vessel.
3. The International, official number 218,721, was built in August Í919 at Ashtabula, Ohio, at the cost of $856,000, by the Great Lakes Engineering Works, being one of a group of 24 vessels of identical plans and specifications built about' that time for the United States Emergency Fleet Corporation. It was designed and built as a dry- cargó vessel with machinery amidships, poop, bridge, forecastle, 4 hatches and 2 masts with cargo booms over each hatch operated by winches on deck; It has a steel hull and is 253.4- feet registered length, 43.7 feet registered breadth, and 26.2 feet registered depth. It is 2,760 gross tons, 1,760 net tons, and 4,370 deadweight tons. Its propulsion machinery consists of triple expansion reciprocating steam engines powered by Scotch boilers. '■ The vessel is of the type generally designated as “lakers” or “lake type” vessels. It was.built for war cargo service in the ocean trade, but due to congestion in coastal shipyards at that time, was' constructed on the Great Lakes. Variations in the usual dimensions of oceangoing cargo carriers constructed on the Great Lakes were necessary in order to enable them to pass through the canals and locks leading to. the sea from the Great Lakes, and at the same time produce a vessel of sufficient cargo capacity *791 to meet the needs of the services. In consequence, it was shorter and of greater depth than ordinary ocean-going cargo vessels of the same cargo capacity. At the time it was requisitioned, the vessel was adapted to and had reasonable prospect of continuing to be adapted to plaintiff’s purposes, hereinafter described, and for certain of the ocean trades during its useful physical life. For the purpose of determining value, the vessel was comparable to other dry cargo vessels of the same age except as to her unusual design, described above.
4. After its construction the vessel was used in the oceangoing cargo service for a comparatively short time. In 1920 it was consigned to the laid-up fleet at Hog Island, near Philadelphia, where it remained some eight years until purchased and removed by the International Packing Company of Seattle, Washington. In early 1928 it was converted to a floating cannery which involved, among other things, providing extra living quarters for fishermen and cannery workers, alterations to provide for and the installation of machinery required for the canning operations, and provision for the storage of the canned fish. From 1928 uiitil it was purchased by plaintiff in 1941, it was based in Seattle, Washington, and each year during the salmon fishing season, which ordinarily extends from June to September, it would sail to the Alaskan fishing grounds and remain there until the close of the fishing season, storing the canned salmon aboard, and returning at the end of the season to Seattle with its cargo. Ordinarily, it traveled a total of 5,000 miles per year. After unloading the cargo of canned salmon at the salt water piers in Seattle, it would be moved into Lake Union, a fresh water lake lying within the city limits of Seattle and connected with Puget Sound by means of a ship canal with locks. It remained moored in Lake Union until the next fishing season. During the period of lay-up in Lake Union, a skeleton crew devoted its full time to maintenance and repair work and kept the vessel in good condition. Each year it was examined by the Bureau of Marine Inspection and Navigation, and every second year was dry-docked. Its lifesaving equipment, radio equipment, and crew accommodations were kept up to date.
*792 ■At the time the vessel was requisitioned, it was in very good condition and in a better state of repair than most other vessels of its age and type. It was classified A-l by the American Bureau of Shipping, after its reconversion to a cargo carrier in November 1941, and maintained this classification until requisitioned. It was last inspected by the Bureau of Marine Inspection and Navigation, prior to requisitioning, on July 3, 1943, when it received a certificate permitting it to navigate all oceans.
5. For many years prior to October 6, 1943, plaintiff had been-engaged in the business of manufacturing fertilizer at Norfolk, Virginia, and other localities, and had been procuring large quantities of potash and other materials from ports in Texas and on the Gulf of Mexico for use in such business. As a general rule, these materials were delivered by ship directly to plaintiff’s plant at Norfolk. In the early part of 1941, realizing the imminence of war and considering the defense activities then in progress in the United States and the probability of curtailment in available -water transportation, plaintiff undertook to obtain a vessel of its own in which it might transport such material to its plant. In April 1941, as a result of these considerations, plaintiff purchased the vessel International from the International Packing Company of Seattle, Washington, and remained the owner of the vessel until it was requisitioned by the defendant.
Plaintiff purchased the vessel on April 24, 1941, for the sum of $250,000 and in further consideration agreed to bare-boat charter the vessel back to the seller for the fishing season of 1941. At the bareboat charter rate then current in the fishing industry for a vessel of this character, the charter for the vessel had a value of approximately $53,112, making a total consideration to the seller of approximately $303,112. The vessel was used by the International Packing Company in its fishing and canning operations during the 1941 fishing season and was redelivered to plaintiff in September 1941. The sale- of the vessel to plaintiff included all equipment except the canning machinery, tools, and equipment, and leased radio and other leased equipment on the vessel, all of which was removed by the seller at its own expense prior to final delivery of the vessel.
*793 6. After final delivery of tlie vessel to plaintiff, it was reconverted from a floating cannery to its original design, namely, a dry cargo vessel, at a cost of approximately $64,000.
7. The reconversion to a dry cargo vessel was completed in November 1941 and the vessel was chartered to W. K. Grace & Company for a voyage with a cargo of lumber from Seattle to Chile, and thence back to the Gulf of Mexico with a cargo of nitrate of soda. That voyage was completed January 19, 1942. Between that time and the date of requisitioning, October 6, 1943, the vessel made ten additional voyages to South America and Caribbean ports from the Gulf of Mexico and Atlantic coast ports, the first two of which were under private bareboat charters, and the remaining eight under time charters to the Maritime Commission, but all at the direction of the Maritime Commission. On its out-going trips the vessel carried cargo of a nature not shown by the evidence, and on the return voyages carried some nitrate of soda, but mostly bauxite. Up to the time of requisitioning, the vessel had not entered the service for which plaintiff purchased it, that is, the transportation of materials for plaintiff’s plants from Gulf ports to Norfolk, Virginia.
8. Between the time the vessel was reconverted from a floating cannery into a dry cargo vessel and the time it was requisitioned by defendant, repairs, renewals, recondition-ings, and similar maintenance work were performed on the vessel at various times and in various places at an aggregate cost of approximately $60,000. This work maintained the vessel in a very good state of repair and had a favorable influence on its probable useful life.
9. On and before the International was requisitioned for temporary use on June 6,. 1942, it was insured by the owners for hull and war-risk insurance in the amount of $425,000. After it was requisitioned for temporary use it was- insured by the War Shipping Administration for $298,200, pursuant to the rate fixed by General Order 9. This amount was not considered adequate by the owners and they carried additional insurance at their own expense in the amount of $125,000, making the aggregate insurance $423,200 for the period from June 6,1942, to October 6,1943.
*794 10. There were no sales of comparable ships between willing sellers and willing.buyers between April 1942 and the day of the requisition of the International, October 6, 1943. There were five such sales, in addition to the sale of the International to the plaintiff, in 1941 and 1942, of ships of practically the same age and specifications as the International, and the average price in those five sales, including the cost of repairs necessary to put the ships sold in sound condition, was approximately $250,000. There was less than a normal number of sales of dry cargo ships of any kind between 1941 and 1944. During the war an American vessel could not be sold on the foreign market without permission of the War Shipping Administration, which generally was not obtainable except for small and very old vessels. A sale of an American vessel could not be made to domestic purchasers without approval of the War Shipping Administration, which approval would be given, only if the vessel was to be put in a trade desired by the Government. The Government requisitioned either the temporary use or the title of all dry cargo ships and the private transfer and use of vessels began to become very restricted in 1942. Commencing in 1939 ship prices increased rapidly until restrictions on sales, fixing of freight rates, and other controls, greatly reduced the number of sales of ships.
• The market value of ships* was lower in October 1943 than it was in 1942.
11. In September 1939, the International had a fair market value of $18 per deadweight ton or $88,600. The increase in its .value between that date and October 6, 1943, was due to the war in Europe and the defense preparation of the United States, which resulted in an abnormal demand for cargo vessels of all types and ages.
12. The reproduction cost of an exact duplicate of the International at the shipyard on October 6, 1943, was $1,171,000. The remaining physical capacity of the vessel to operate in the service for which it was best adapted was more than ten years. In 1943, the need for cargo ships still exceeded the supply, shipyards .were working to full capacity, prices and wages were high, the trend of construe *795 tion costs was upward, and the elements of time and availability of ships were of great importance. Based upon the reproduction cost of $1,171,000, depreciated at the rate of 4% per annum on annually diminishing balances for 24 years and two months, the interval between the time of construction and the date of taking, the depreciated reconstruction costs of the vessel as of October 6,1943, would have been $436,678.17.
13. The original specifications upon which the reproduction cost above stated was based contained many items which were not structurally a part of the vessel but were necessary to its operation, including but not confined to anchors, cables, blocks, lifeboats and equipment, lamps, navigating equipment, machine and carpentry tools, furniture, and galley and pantry equipment. When the vessel was taken by the defendant on October 6, 1943, all equipment of the nature above-described then being on the vessel was also taken by the defendant, including all equipment and spare parts answering the descriptions detailed in the specifications as well as similar equipment and spare parts in addition to'those detailed in the specifications.
14. The value on October 6, 1943, of that portion of the 'equipment and spare parts which was in addition to those detailed in the original specifications was $15,442.82.
15. When the vessel was taken by the defendant on October 6,1943, it was in need of repairs of the reasonable cost of $17,675. '
16. The fair and reasonable value of the International and all equipment and spare parts taken by the Government was, on October 6,1943, $290,000.
. CONCLUSXON oi\ law
Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover $112,985.93 with interest as a part of just compensation at 4 percent per annum from November 21, 1944, to the date of payment of the judgment, and interest at 4 percent per annum on $290,000 from October 6, 1943, to November 20, 1944.
*796 It is, therefore, adjudged and ordered that the plaintiff recover of and from the United States One Hundred Twelve Thousand Nine Hundred Eighty-Five Dollars and Ninety-Three Cents ($112,985.93) with interest as a part of just compensation at 4 percent per-: annum from -November 21, 1944, to the date of payment of the judgment and interest at 4 percent per annum on $290,000 from October 6,1943, to November 20, 1944.
OPINION
Madden, Judge, on December 6,1948, delivered the opinion of the court:
This is an action for just compensation for the requisitioning, by the Government, on October 6,1943, of the plaintiff’s vessel International. The International, then named the Lake Singara, was built in 1919 by the Great Lakes Engineering Works at Ashtabula, Ohio, at a cost of $856,000. It was one of 24 identical ships built at that time for the United States Emergency Fleet Corporation. It was built as a dry cargo carrier 253.4 feet long, 43.7 feet wide and 26.2 feet deep. Its rating was 4,370 deadweight tons, 2,670 gross tons and 1,760 net tons. It is of the type known in shipping circles as a “laker.” It was, however, built for ocean service, the reason it was built at a lake yard being that all ocean yards were, at the time, busy with the construction of other ships. Because it was intended that it should be taken to the ocean, it and other ships of its type were built shorter than the usual ship of its capacity, so that it could pass through the locks to get to the ocean. Because of the shortness, they were made deeper to obtain the desired capacity.
The vessel was launched and taken, into the Atlantic Ocean through the Welland Canal and the St. Lawrence River. It was used for a short time in ocean cargo service, but in 1920 was laid up along with many other ships at Hog Island near Philadelphia, and remained laid up until 1928. In that year it was purchased by the International Packing Company, of Seattle, Washington, and its name was changed to International. The packing company converted the vessel to a floating cannery, which required extensive installations *797 for the housing of fishennen and cannery workers, for canning machinery and for the storage of canned salmon.
During the years 1928-1940 the International was based in Seattle and each year went from there in June to the Alaska salmon fishing grounds, remaining there until early in September, when it returned to Seattle with its season’s product. After unloading it- was moved into Lake Union, a fresh water lake connected with Puget Sound by a canal with locks, and remained moored in Lake Union until the next fishing season. A maintenance crew was on board during the time the vessel was laid up, which kept it in good repair.
On April 24,1941, the plaintiff purchased the International from the packing company for $250,000 plus the right in the latter to use the vessel for the fishing season of 1941. Such a bareboat charter had a value of some $53,112. The packing company finally delivered the vessel to the plaintiff in September 1941, after having removed all the equipment pertaining to the canning industry. The plaintiff had the vessel reconverted to a dry cargo vessel, the use for which it was originally designed. For this reconversion the plaintiff spent some $64,000. The reconversion was completed in November 1941.
The plaintiff purchased the vessel to transport potash and other materials which it used in its business of manufacturing fertilizer, from ports on the Gulf of Mexico to its plant in Norfolk, Virginia. It realized that a shortage of shipping space was imminent, and thought that it would be advantageous to have its own vessel. It was, however, never permitted to use the vessel to transport its own materials. Instead, the ship made 11 trips to South American and Caribbean ports from Atlantic and Gulf Coast ports, three of them under private bareboat charters for which the United States Maritime Commission regulated the charges, and the other eight under time charters requisitioned by the War Shipping Administration. During the period of about two years that the vessel operated under these charters, until it was finally requisitioned by the Government on October 6,1943, repairs', *798 renewals and maintenance work on the vessel cost the plaintiff some $60,000 and kept the vessel in a good state of repair. During this time the vessel was classified A-l by the American Bureau of Shipping, a reputable ship inspection service. It was inspected on July 8, 1943, by the Bureau of Marine Inspection and Navigation, an agency of the Government, and on July 3,1943, was given a certificate permitting it to navigate all oceans for the ensuing year. . .
As we have said, the War Shipping Administration requisitioned the title to and took possession of the vessel on October 6, 1943. It did this pursuant to Section 902 (a) of the Merchant Marine Act of 1936, as amended, 53 Stat. 1255, 46 U. S. C. 1242 (a), and Executive Order 9054 of February 7, 1941. It took all spare parts and expendable equipment that were on the vessel. On July 28,1944, it offered the plaintiff $236,018.78 as just compensation. The plaintiff rejected the offer and, on November 20, 1944, the Government paid the plaintiff $177,014.07, which was 75% of the amount offered. The plaintiff’s acceptance of this sum did not, under the statute, affect its right to sue for an amount larger than the sum offered, and it has done so.
The plaintiff and the Government differ widely in their valuations of the vessel as of the time of its taking. The plaintiff has proved that the cost in 1943, of building a ship identical to the International would have been about $1,171,-000. It urges that, there being no free market in ships in 1943, the only basis upon which the .value of this ship can be determined for the purpose of awarding just compensation is the basis of the then cost of its reproduction new, less its depreciation over the 24 years that had then, elapsed since it was built in 1919. On this basis, and applying a depreciation rate of 3% on a diminishing balance, the plaintiff seeks a judgment for $586,592.05 for. the vessel and the spare parts that were taken with it. The Commissioner of this court, using the same method but a 4% depreciation rate, arrived-.at a value of $434,445.99.
The Government, on the other hand, asserts that there -was, in 1941 and 1942 a market for ships like the Internet, tional; that the market price when there was a market was *799 about $250,000, which was the average of the prices at which five such ships were sold; that the price of ships was lower in 1943 than it had been in 1941 and 1942, and hence the $250,000 price would be just compensation. The Government urges also that if 1943 value is to be determined on the basis of the cost of reproduction new, less depreciation, the rate of depreciation should be 5%. Applying this rate to the somewhat lower cost of reproduction new for which the Government contends, a 1943 value of about $265,000 is obtained.
We think that the cost of reproduction new less depreciation method of determining value for the purpose of giving just compensation is extremely unsatisfactory when applied to cases of this kind. It assumes a permanence and a regularity of market over a long period of years which has never existed in regard to ships. During the more than two decades of the life of the International, the price per ton of shipping has varied from figures approaching zero to a price of some $60 a ton admitted by the Government, with the plaintiff claiming a price of about $130 a ton. With such variations, any relation between any asserted price and the cost of reproduction new less depreciation is either largely accidental or is produced by varying the percentage of depreciation in order to produce a result not too irrational for possible acceptance. By applying reproduction new less depreciation, the International, built in 1919 at a cost of $856,-000, would have been worth most of that amount during the years 1920 to 1928. In fact its dollar value was substantially nothing, and it was laid up, along with numerous other ships, because no one would give anything for them. These were prosperous years, but ships were in oversupply because so many had been built during and immediately after the First World War. In 1939 the market value of the ship was some $88,000 and there is no reason to suppose that it had been higher than that during any of the years 1928-1939. With twenty of the twenty-four years of the life of the International before she was requisitioned-elapsed, we see that in none of those years was there the slightest correlation between cost of reproduction less depreciation and market value. This experience argues strongly against any thought that cost *800 of reproduction, new less depreciation, and market value are, by and large, about the same so that in the absence of an actual market the other method may be expected t0' give a result fairly comparable to what the market value would have been, if there had been a market. And it argues that, to avoid purely capricious valuations having no relation to true value, every effort should be made to bridge across the gap during which there was no market by projecting the former market, if it was not too remote, on the trend shown by the evidence, or of which we are judicially aware, thus reaching, as nearly as we can, the figure that we think a willing buyer would have given a willing seller for the ship.
We recognize, of course, that reproduction new less depreciation is a useful aid in determining the value of property such as public utility plant and equipment which is, normally, used and used up in the service and which, if removed, would have to be replaced at the then cost of construction, in order that the service continue. The protected monopoly market of the product of the utility gives assurance of the continuing ability of its equipment to earn an income. History shows that none of these elements of stability exist for ships such as the International.
We look now to the evidence of market value of the International on October 6, 1943. There were five sales of comparable ships in 1941 and 1942, and the average price was $250,000. Because of the volume of ship construction which had been attained by that time, and the fact that the submarine menace had been greatly diminished, the trend in ship prices was downward, and prices were somewhat lower than in 1942. On the basis of those facts, the market values of 1941 and 1942, when there was a market, seem to us to be the most dependable evidence of the value of the International on October 6, 1943. We have no idea that a willing buyer would, in those days when it was fairly evident that what .would be an enormous excess of cargo shipping was being built up, which in time would be as useless as the similar excess after the First World War, would have paid any such price as the plaintiff claims, for a ship 24 years old and of unconventional design. He could not have expected to get *801 his investment out of the ship during the period of inflated values. The plaintiff had bought the International in 1941 for its own use, but it had never been allowed to use it, as the Government required that it be diverted to more important uses. It made no profit out of its chartered voyages, because the Government dictated the rates that it could charge. With no prospect of even a temporary operating profit, and with a clear likelihood of an almost total capital loss, we think that a prudent buyer would have paid no more attention to cost of reproduction new less depreciation than buyers had done in all previous years. The plaintiff on July 17, 1948, on its own books charged off depreciation at the rate of 25% per an-num with the explanatory note “In view of the present shipbuilding program this vessel will be obsolete at the termination of the war and will be virtually worthless.” Although this large charge-off for depreciation was abandoned, it is interesting evidence of the opinion of the plaintiff’s agents four months before the taking.
The International, because of its nonuse and limited use for so many of its years, and because it had been unusually well maintained and much of its interior construction was new, and because it had a more than ordinary complement of spare parts, was, we think, worth somewhat more than the average ship of its tonnage. Without pretending to any mathematical accuracy which we do not feel, we conclude that the value of the International and its equipment and spare parts on October 6, 1948, was $290,000, and that that is the measure of just compensation for its taking. The plaintiff is, therefore, entitled to recover interest, as a part of just compensation, at 4% per annum on $290,000 from October 6, 1943, to November 20, 1944, on which date the Government paid the plaintiff $177,014.07. The plaintiff is further entitled to recover $112,985.93, the difference between $290,000, and $177,014.07, and interest at 4% per annum on $112,985.93 from November 21,1944, to the date of payment of the judgment rendered herein.
It is so ordered.
Howell, Judge; Whitakek, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.