Whitaker, Judge,
delivered the opinion of the court:
The issue presented in this case is the just compensation to which the plaintiff is entitled for the taking by defendant, under a bareboat charter, of the possession and use of the American steamship Hawaiian during the period from July 7,1943, to May 1,1946.
Plaintiff says that it is entitled to a rate of $6.00 per deadweight ton per month throughout the requisition period, less the amounts already paid by defendant on account, plus interest, as a part of just compensation, at the rate of 4 percent per annum on each monthly installment beginning August 1, 1943, and continuing to the date of payment of the judgment herein, subject to certain adjustments.
Defendant says that the “bareboat requisition rate” should not exceed that fixed by the War Shipping Administration, which was $1.25 per deadweight ton per month, plus appropriate allowances for the Hawaiian's deadweight tonnage and speed.
The Hawaiian was a steam freighter built in 1919, of 9,460 deadweight tons, and with a speed in excess of 12 knots. Her particulars are further described in finding 4.
On July 7,1943, the War Shipping Administration, acting pursuant to section 902 (a) of the Merchant Marine Act of 1936, 49 Stat. 1985, 2015, as amended, 46 U. S. C. § 1242, requisitioned the Hawaiian on a “bareboat” basis. It retained possession and use of the vessel until it was redelivered to plaintiff on May 1,1946,
*368 On July 31, 1944, approximately a year after the requisition, the War Shipping Administration tendered plaintiff a bareboat form of charter party for the Hawaiian containing, inter alia, an offer of hire at the rate of $12,108.80 per calendar month. This was at the rate provided by War Shipping Administration General Order No. 37, issued April 7, 1944, which fixed a basic rate of barebo'at charter hire for dry cargo vessels built during the period 1914-1934 at $1.25 per deadweight ton per month, plus certain allowances for vessels having speeds equal to or in excess of 10% knots. The hire tendered for the Hawaiian was at the rate of $1.28 per deadweight ton per month, the sum of the basic rate established by General Order No. 37, plus an additional 3 cents allowed for vessels with speeds exceeding 10% but less than 12 knots. As the Hawaiian’s speed exceeded 12 knots, she was entitled under General Order No. 37 to 6 cents, instead of 3 cents, in addition to the basic rate of $1.25 per deadweight ton per month.
On August 24, 1944, plaintiff declined to accept either the form of charter or the rate of hire offered. As required by section 902 (d) of the Merchant Marine Act of 1936, supra, defendant made monthly payments to plaintiff, between March 24,1944, and August 16,1946, aggregating $307,079.74 for the use of the Hawaiian. The aggregate amount of these payments on account is equivalent to hire at the rate of 96 cents per deadweight ton per month for the bareboat requisition period, or 75 per cent of hire at the rate of $1.28 per deadweight ton per month.
Plaintiff sues to recover hire at the rate of $6.00 per deadweight ton per month, less the amount already received by plaintiff on account, or net compensation of $5.04 per deadweight ton per month for the bareboat requisition period of 33 months, 25 days, 5 hours, and 10 minutes, plus interest as a part of just compensation for defendant’s delay in payment.
In determining what is just compensation, each case must be decided upon its individual facts, although the courts are guided to their conclusions by certain broad principles, well known, often quoted, and often difficult of application in specific instances. Dore v. United States 119 C. Cls. 560, *369 581. Just compensation has been defined as “the sum which, considering all the circumstances — uncertainties of the war and the rest — * * * would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy.” Brooks-Scanlon Corp., v. United States, 265 U. S. 106,123-124; Olson v. United States, 292 U. S. 246, 257. This is but another way of saying that fair market value, where there is a free market, is the usual standard of just compensation. United States v. Commodities Trading Corp., 339 U. S. 121,123; Olson v. United States, supra, p. 255; Monongahela Navigation Co., v. United States, 148 U. S. 312, 326; Boom Company v. Patterson, 98 U. S. 403, 407. Where, for any reason, property has no market, resort must be had to other data to ascertain its value, although this “involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety.” United States v. Miller, 317 U. S. 369, 374. The ascertainment of value is not controlled by rigid rules or artificial formulae; what is required is a “reasonable judgment having its basis in a proper consideration of all relevant facts. Minnesota Rate Cases, 230 U. S. 352, 434.” Standard Oil Co., of New Jersey v. Southern Pacific Co., 268 U. S. 146, 156.
There was no free market for the use of large, oceangoing, American-flag freighters such as the Hawaiian at the time of her taking on bareboat basis on July 7,1943. In April 1942, the use of all such privately owned vessels had been requisitioned on time charter basis by the War Shipping Administration. From that time, if not before, there was no free market for the use of the Hawaiian. The court must, therefore, base its determination on other data, even though the inquiry may involve what is “at best, a guess by informed persons.” United States v. Miller, supra, p. 375.
The requirement of the Constitution is that the Government must pay for property it takes a compensation which is “just.” By that is meant, of course, what is just to the owner and to the Government. Justice is no absolute term. It frequently requires give and take. For one to demand all that the law allows may do injustice to the other. Shylock, in Shakespeare’s Merchant of Venice, was entitled under the law to his pound of flesh, but, as we see it today, it would *370 have been an injustice for him to have taken it. Justice is a nice balance of the equities.
This was not so under the old common law of England; but equity intervened to ameliorate the rigors of the law. When our Constitution was adopted, and today, justice means the law tempered by the principles of equity.
Plaintiff says that the level of earnings realized by owners from the use of freighters such as the Hawaiian from the carriage of commercial cargo some months prior to the general requisitioning in April 1942 could have been realized by plaintiff throughout the bareboat requisition period if the Hawaman had not been taken by defendant, but had remained in plaintiff’s possession and control.
This is unrealistic. The country was at war. Various and sundry controls had been established that affected the use of plaintiff’s vessel. Controls authorized by statute are necessary for the defense of the nation and are lawful, unless they are in conflict with the Constitution. Conditions when the boat was requisitioned were radically different from those existing 'before the war. What the boat earned before the war is no measure of what she could have earned during the war.
Just compensation for the use of the Hawaiian is not to be measured by the value of her use before the market was “interfered with” by the Government, as plaintiff says. In arriving at the amount which probably would have resulted from fair negotiations between an owner willing to let, and a charterer desiring to hire the Hawaiian, lawful governmental regulations, restrictions, and controls cannot be ignored. American-Hawaiian Steamship Company v. United States, 85 F. Supp. 815, aff’d. 191 F. 2d 26, cert. den. 342 U. S. 941; cf. Smith-Douglass Co., Inc., v. United States, 126 C. Cls. 758, 763. Any just and equitable valuation, fairly reflecting a consideration of all relevant facts, must of necessity take into consideration all of the conditions then existing, including lawful legislative and administrative restrictions on the use of the property valued.
But we are, of course, aware that the constitutional requirement that the Government must pay just compensation for what it takes is one which war does not suspend, alter, or *371 modify. United States v. New River Collieries, 262 U. S. 341, 343; United States v. L. Cohen Grocery Co., 255 U. S. 81. The principles to be applied by the courts do not vary, whether the power to take be exercised in time of war or in time of peace.
Defendant contends that the bareboat requisition rate should not exceed the basic rate allowed by General Order No. 37 of $1.25 per deadweight ton per month, plus appropriate allowances for speed.
Defendant’s position is also untenable. In the first place, this rate is not binding on the courts. Especially in a case where the rate fixed is not one applicable between private parties, but only as between the Government, who is the taker, and the owner, whose property is taken, a rate fixed by the Government should not be conclusive. The ascertainment of just compensation is not an administrative but a judicial function; no power exists in any administrative agency of the Government to declare what that compensation should be or to prescribe any binding rule in that regard. Monongahela Navigation Co. v. United States, supra, p. 327; Gulf Refining Co. v. United States, 58 C. Cls. 559, 576.
While mindful of the complexity of the task confronting the War Shipping Administration, we are of the opinion that any method aimed, as was that of the War Shipping Administration, at the establishment of a rate applicable to all of a large class of dry cargo vessels, is “plainly inaccurate” when applied to any particular vessel. Gulf Refining Co. v. United States, supra, p. 577. There can be no presumption as to the correctness or the fairness of a rate made applicable indiscriminately to all vessels of a certain class. Although it may be impracticable, from the Government’s standpoint, to determine just compensation for each particular vessel, the right to a judicial determination, if the owner is dissatisfied with the compensation determined for his vessel, is guaranteed by the Merchant Marine Act and by the Fifth Amendment. This court, while giving weight to the administrative determination, must nonetheless determine from the facts proven what it thinks is just compensation. Borland v. United States, 57 C. Cls. 411, 415.
*372 We do not mean to imply that the basic rate established by the War Shipping Administration might not, under appropriate circumstances, be coterminous with just compensation for a particular vessel; but we must conclude on the record before us that the bareboat requisition rate fixed by defendant as the yardstick to measure just compensation for all vessels of the Hawaiian’s class is not “just” in her case.
Plaintiff’s vessels were used in the intercoastal trade prior to the outbreak of war in Europe in 1939. The testimony discloses earnings for the last quarter of 1939, the last quarter of 1940, and the last quarter of 1941. For these three periods they were $1.29, $2.23, and $3.27 per deadweight ton per month, respectively. On voyages in foreign trade, commencing in 1941 and terminating in 1941 or 1942, including voyages under time charter with the Maritime Commission, plaintiff’s profits, before overhead, depreciation and taxes, were $4.19 per deadweight ton per month. Exclusive of such voyages under time charter with the Maritime Commission, its profits were $5.13 per deadweight ton per month, before overhead, depreciation, and taxes.
On the other hand, the War Shipping Administration had fixed a rate for time charters of vessels such as the Hawaiian at a basic rate after May 1942 of $4.15 per deadweight ton per month, which had been agreed to by the owners, including plaintiff, reluctantly, it is true, and after threat of requisition of title by the War Shipping Administration, but nevertheless agreed to. Applied to the Hawaiian this would have amounted to $4.35 on a time charter. As near as we can tell from the testimony, plaintiff’s average cost of operation of its vessels under requisition time charters, exclusive of overhead, depreciation, and taxes, was $1.89 per deadweight ton per month.[1] This leaves $2.46. Plaintiff accepted this, although under some compulsion. It cannot be denied, however, that the War Shipping Administration “beat the owners down” as much as they could in establishing a rate of hire.
Prior to requisition on a time charter basis, in April 1942, plaintiff had of course been making high profits. But, even *373 in the absence of restrictions, war conditions would no doubt have reduced these profits; except for the restrictions, they would no doubt have been considerably in excess of the figure of $2.46.
Plaintiff’s vessel was old. Its useful life was short. This, of course, affects the rate to be paid.
None of the things we have mentioned give any satisfactory basis for fixing just compensation, but taking everything into consideration, among others the general characteristics of the vessel, her physical condition, her age, her earnings before requisition on a time charter basis and afterwards, the demand for and supply of shipping space, legislative and administrative restrictions, and the uncertainties of the war, we have concluded that $2.50 a deadweight ton per month is “just” both to the owner and the Government.
We do not need to discuss deductible enhancement. The restrictions imposed more than offset any enhancement due to the causes that necessitated the taking. Smith-Douglass Co., Inc., v. United States, 126 C. Cls. 758, 767.
Plaintiff is entitled to recover from the defendant hire at the rate of $2.50 per deadweight ton per month, less the amounts paid by defendant on account. In addition, plaintiff is entitled to recover interest, not as interest but as a part of just compensation, at the rate of 4 percent per annum on the unpaid balance of each monthly installment, beginning August 1, 1943, and continuing to the payment of the judgment herein.
Entry of judgment is suspended pending the incoming of a stipulation by the parties showing thhe amount due, computed in accordance with this opinion. In the absence of such a stipulation within a reasonable time, the case will be remanded to a Commissioner for a report showing the amount due, computed in accordance with this opinion.
It is so ordered.
Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
Laramore, Judge, took no part in the consideration or decision of this case.
*374 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Currell Yance, and the briefs and argument of counsel, makes findings of fact as follows:
1. At all times relevant to this case, the American steamship Hawaiian was wholly owned by the plaintiff, American-Hawaiian Steamship Company, a New Jersey corporation, organized in 1899. On July 7,1943, at 6: 50 p. m., the defendant, acting through the War Shipping Administration, took the possession and use of the Hawaiian at Baltimore, Maryland, on “bareboat basis.” The taking was by requisition under authority of Section 902 (a) of the Merchant Marine Act, 1936, as amended. Possession and use of the vessel by the War Shipping Administration under such requisition continued until she was redelivered to the plaintiff at Bichmond, California, on May 1, 1946, at 12:00 midnight.
2. By letter dated July 31,1944, the War Shipping Administration tendered plaintiff a demise or “bareboat” form of charter party describing the Hawaiian as having 9,460 tons deadweight capacity and setting forth proposed terms of the use of the Hawaiicm during the bareboat requisition period, including an offer of hire at the rate of $12,108.80 per calendar month. The terms of the charter tendered were those prescribed by War Shipping Administration General Order No. 13, Supplement 1, issued April 7,1944. The hire offered was specified in War Shipping Administration General Order No. 37, also issued April 7,1944, “to establish * * * rates of charter hire for self-propelled ocean-going iron and steel vessels * * * requisitioned for use pursuant to the provisions of Section 902 of the Merchant Marine Act, 1936, as amended * * *.” Under General Order No. 37, the rate of bareboat hire for dry cargo vessels built during the period 1914-1934 was $1.25 per deadweight ton per month, with certain additional allowances for vessels having speeds equal to or in excess of 11 knots. The hire tendered for the Hawaiicm was at the rate of $1.28 per deadweight ton per month, being the sum of $1.25 and an additional $0.03 provided for vessels having speeds equal to or exceeding 11 knots *375 but less than 12 knots. As the Hawaiian's speed exceeded 12 knots (see finding No. 4), she was entitled under General Order No. 37 to $0.06 instead of $0.03 in addition to the basic $1.25 per deadweight ton per month.
3. On August 24, 1944, plaintiff wrote the War Shipping Administration declining to accept either the form of charter or the rate of hire offered. As required by Section 902 (d) of the Merchant Marine Act, 1936, as amended, defendant made, between March 24,1944, and August 16,1946, monthly payments to plaintiff aggregating $307,079.74, on account of just compensation for the use of the Hawaiian. The aggregate amount of such payments on account was equivalent to hire at the monthly rate of $9,081.60 or 98$ per deadweight ton for the bareboat requisition period of 33 months, 25 days, 5 hours and 10 minutes and was also equivalent to 75% of hire at the rate of $1.28 per deadweight ton per month, tendered by defendant on July 31,1944.
Thereafter, plaintiff brought this suit to recover, as just compensation for the use of the Hawaiian, hire at the rate of $6.00 per deadweight ton per month, less the hire which the defendant has already paid on account at the rate of 96$, the net compensation claimed being equivalent to $5.04 per deadweight ton per month. In addition, plaintiff also claims compensation for defendant’s delays in payment.
Settlement has been made of the claims of plaintiff and defendant, respectively, for consumable stores and fuel aboard the vessel when the requisition period began and ended and also of plaintiff’s claims for reconditioning of the vessel on her release from requisition.
4. At all times material to this suit, the Hawaiian was a steel, ocean-going, single-screw, steam freighter built in 1919, documented under the laws of the United States, and was classed A1 by the American Bureau of Shipping.
Her deadweight carrying capacity was 9,460 tons and her bale cubic capacity was 413,495 cubic feet. She was designed to carry all types of goods, except liquids in bulk and refrigerated cargo, but was especially well suited for the carriage and handling of general cargo by reason of having three complete decks, an extra (orlop) deck in No. 1 hold, 5 cargo hatches, and 7 sets of cargo gear.
*376 The vessel’s propelling machinery consisted of quadruple-expansion, reciprocating engines of 3,400 indicated horsepower and four oil-burning, scotch-type boilers, giving her a speed in excess of 12 knots. By reason of her bunker capacity of 16,306 barrels and daily consumption of 206 barrels, the Hawaiian had a cruising radius of 23,420 miles.
The register dimensions of the vessel were: length, 404.6 feet; breadth, 53.9 feet; depth, 26.2 feet. Her draft on summer load line was 28' 5y±" and her corresponding gross register tonnage was 6,264 tons.
Her equipment included a heavy lift boom, special lockers for valuable cargo, radio direction finder, electric sounding machine and spare parts in excess of those required by the American Bureau of Shipping.
The crew complement, including master, was 39.
The Hawaiian was acquired by plaintiff in 1925 at a cost of $375,000. As of December 31, 1937, her total capital costs to plaintiff had amounted to $414,669.55, and she was carried for tax purposes on the books of the company at a remaining value of $99,859.05. As of December 31,1943, the Hawaiian was listed for tax purposes as having a remaining value of $13,519.99, and a remaining life of one year.
Defendant does not contend that, as applied to the Hawaiian,, the basic valuation of $56.25 per deadweight ton (plus allowances for speed) as of April 1944 found by the War Shipping Administration in connection with the issuance of General Order No. 37 (see finding 30) was too high.
5. Surveyors and inspectors representing both plaintiff and defendant examined the Hawaiian, both in drydock and afloat, at or about the time of her taking in July, 1943, and found her to be in good condition.
6. Neither at the time of her taking nor at any subsequent time during the bareboat requisition period of the Hawaiian was there a free market in the United States for the use of large, ocean-going, American-flag freighters because on April 18, 1942, the use of all such privately-owned vessels had been requisitioned on “time charter basis” by the War Shipping Administration. The War Shipping Administration continued to retain possession and use of substantially *377 all such freighters from April 1942, until after March 2, 1-946.
The period of Government use of a number of such freighters began even prior to the general requisitioning in April 1942. The United States Maritime Commission and its successor agency, the War Shipping Administration, had acquired the use of many such freighters by chartering them directly at various times after June 2,1941. Those agencies had also controlled the employment of various other freighters by directions given in the course of administering the Ship Warrants Act of July 14,1941 (55 Stat. 591). In such cases, the agencies prescribed the rates of charter hire at levels generally below current market rates. (See Finding No. 21.)
7. Worldwide changes in conditions affecting the profitability of commercial merchant shipping occurred as a result of the outbreak of war in Europe in September 1939.
Prior to the war, there had been an oversupply of shipping throughout the world and particularly in the United States. Afterwards, a worldwide shortage of vessels available for trade developed and, by the end of 1940, shipping space was hard to get. For the first time in years, capacity cargoes were available both outward and homeward.
Under such conditions, economic factors, applicable alike to water and rail carriers, caused earnings of carriers to increase in much higher proportion than the mere rate of increase in traffic, one principal cause being the fact that the costs of carriage do not increase proportionately to increases in the quantity of cargo carried per vessel or train or in the length of the haul. It follows also that an increased rate of earnings does not necessarily imply an increase in the level of tariff rates charged to shippers.
As a result of the foregoing conditions, the commercial earnings of large, American freighters rose sharply during the period 1939-41.
There is no evidence that the ocean tariff rates charged to shippers at the levels fixed by conference carriers at any time during this period exceeded rates justifiable under the conditions, although some charges being assessed in 1941, *378 “mostly other than conference rates,” were, in the opinion of the Maritime Commission, excessive.
8. None of the increased carryings of American-flag freighters during the two years following November 4,1989, included munitions of war or other traffic to or from the combat zones in Europe because the Neutrality Act of November 4, 1939 (54 Stat. 4), excluded our merchant vessels from those zones.
Among the principal underlying causes for the increase in carryings and earnings of American freighters during this period were the following:
(a) The decrease in the effective world supply of freighters available for commercial employment as a result of such war conditions as sinkings, immobilization by blockade, delays by war damage, delays by convoy operations in combat zones, and diversion by belligerents of their own merchant vessels to military use or to use in combat areas from which our shipping was excluded by the Neutrality Act;
(b) The increase in volume of traffic available to American-flag freighters in foreign trade by the decline in competition from foreign-flag freighters on routes outside the combat zones;
(c) The increased proportion of traffic producing higher freight revenues resulting from increased exports of manufactured goods from the United States after Europe was cut off as a source of supply to other world areas;
(d) The general improvement in business conditions in the United States.
9. The earnings of freighters are derived from two principal kinds of operations: (a) charter operation; and (b) berth operation. In addition, some vessels are operated by industrial carriers serving primarily their parent companies.
(a) In a charter operation, a single charterer contracts with the shipowner for the entire carrying capacity of the vessel in consideration of which the charterer agrees to pay the shipowner either a monthly rate of charter hire, as in the cases of bareboat charters and time charters, or an agreed freight per voyage, as in the case of voyage or “trip” charters. Voyage charter freight may be fixed at a stated rate per ton *379 or other unit of cargo (a rate charter), at a stated rate per unit of the vessel’s cargo space (a space charter), or at a lump sum (lump sum charter).
Under the usual bareboat charter, the charterer has full possession and operation of the vessel and pays all expenses, including upkeep.
Under the usual time charter, the shipowner retains possession and operation of the vessel and pays for her supplies, crew, repair and ordinary insurance, but the charterer pays for fuel, cargo and port expenses and also for war risk insurance on the vessel.
Under a voyage charter, the shipowner operates the vessel at his expense. The cargo and port expenses and cost of war risk insurance may be borne either by the shipowner or charterer or partially by each, depending on the terms of the charter. Under a “net form” voyage charter, the charterer or cargo owner pays the expenses incident to the loading and discharge whereas under a “gross form,” the ship pays such expenses.
If a charterer is a common carrier or if he subcharters to others, his profit is the difference between (a) the charterer’s revenue from freights which he obtains from the actual shippers of cargo or from the subcharterer, and (b) the charterer’s expenses which include charter hire or freight and such vessel, voyage, cargo or other expense as the terms of the charter may place on the charterer.
(b) In berth operation, the shipowner is a common carrier transporting goods for the general public at freight rates fixed in conference or other tariffs and paying all the expense of the operation. The entire earning power of the vessel is realized by the shipowner in berth operations, instead of being divided between the owner and the charterer as in charter operations, where the shipowner realizes less than the entire earning power of the ship in the interest of obtaining certainty of income.
10. Plaintiff was engaged, in the normal peacetime operations of the company, in the intercoastal trade. The earnings of plaintiff’s fleet of 32 freighters in 1941 and in 1942, up to the time of their requisitioning by defendant on time *380 charter basis, were derived from operations both in the domestic and foreign trades. In the domestic intercoastal trade plaintiff maintained a berth operation. In the foreign trade plaintiff engaged in both charter operations and berth operations with 20 of its vessels.
The earnings per deadweight ton per month (before overhead, depreciation, and taxes) realized by plaintiff from in-tercoastal voyages terminating in the last quarters of 1939, 1940 and 1941, are as follows:
1939_ $1.29
1940_ 2. 23
1941_ 3. 27
Plaintiff’s charter operations in foreign trade in 1941 and 1942 (other than those under certain time charters to the United States Maritime Commission) were of two kinds: (a) under 10 commercial time charters made to other private operators; and (b) under 10 space charters to the British Ministry of War Transport for voyages outward from the United States to ports in the Bed Sea.
Plaintiff’s berth operations in foreign trade consisted of: (a) return voyages to the United States after conclusion of the space charters to the Bed Sea; and (b) three round voyages between the United States and ports in South Africa.
11. The average earnings realized by plaintiff from all voyages which commenced in 1941 and terminated in 1941 or 1942 by all plaintiff’s vessels operating in foreign trade (except from voyages under charters to the Maritime Commission), were as follows:

*381
Average profit per deadweight ton per month from all plaintiff’s foreign trade voyages in 19kl-l$

(Before overhead, depreciation and taxes)
$6,824,807.16 _ 1,330,687.93 $
(After overhead and before depreciation and taxes)
$6,824,807.16-$240,480.00 1,330,687.93 $4.95
The average earnings realized by plaintiff from 14 voyages under time charters with the Maritime Commission, with the first voyage beginning on October 17, 1941, and the last terminating on October 12,1942, were $2.54 per deadweight ton per month, before overhead, depreciation, and taxes.
The average profit per deadweight ton per month from all plaintiff’s foreign trade voyages in 1941-42, including those under charters to the Maritime Commission, was, before overhead, depreciation, and taxes:
$8,761,612.69 „„ 2,093,147.93
12. The earnings realized by plaintiff’s vessels were typical of the earnings being realized in foreign trade by large American freighters generally during the period preceding the general requisitioning in 1942 (See Findings Nos. 13,14, 15, and 16), such earnings reaching peak levels in June 1941, and thereafter declining, as the result of the passage of the Ship Warrants Act. Although the evidence establishes that levels of earnings did decline somewhat from peak levels of June 1941, the amount thereof cannot be determined with reasonable accuracy from the record.
13. Illustrative of the earnings then available in foreign berth operations were the earnings of three American freighters of the Hog Island type, which States Marine Corporation bought in late 1940 or early 1941.
Before the outbreak of war in Europe in September 1939, States Marine Corporation operated entirely with chartered foreign-flag vessels. The number of charters which they made per year averaged about 300. An average of *382 40 time chartered vessels was used to maintain about twelve berth services from the United States to Europe, South Africa and Japan. In addition, the company engaged in numerous full cargo trades and acted as agents for others.
As a result of the scarcity of foreign-flag vessels in 1940, the company began chartering American-flag vessels and also purchased the three Hog Island vessels in question. Until they were requisitioned on time charter basis in 1942, these three vessels were employed on 23 voyages in the company’s berth service between the United States and South Africa. The first voyage began on October 30, 1940, and the last voyage terminated on May 13, 1942. The average profit of the three vessels while so operated amounted to $4.92 per deadweight ton per month (apparently before overhead, depreciation and taxes).
14. The profitability of American freighters in charter or “tramp” operations in foreign trade during 1940-42 is shown by the earnings of two Hog Island vessels, the Ann Shahel and the Patricia Shahel, purchased in December 1940 and January 1941, respectively, by subsidiaries of Parry Shipping Company, Inc., of New York. Operating under various forms of charter, the vessels loaded or discharged cargoes in the United States, the Far East, India, South America, Canada, and West Africa.
From the voyages of the Arm Shahel completed within the company’s fiscal year ending October 31, 1941, her earnings were $4.22 per deadweight ton per month before depreciation, overhead, and Federal income taxes. From the voyages of the Ann Shahel completed within the company’s fiscal year ending October 31,1942 and prior to requisitioning of the vessel by the War Shipping Administration on May 8, 1942, her earnings were $2.94 per deadweight ton per month before overhead, depreciation, and Federal income taxes. The average earnings of the vessel from the time of its purchase in December 1940 until its requisition by the War Shipping Administration on May 8, 1942 were $3.79 per deadweight ton per month before overhead, depreciation, and Federal income taxes.
The first voyage of the Patricia Shahel consisted of a space charter from New York to Vladivostok, a voyage charter for *383 a cargo of sugar from Java to Ceylon and a voyage charter with a cargo of ore from India to Baltimore, occupying 176 days from the beginning of loading in New York on January 29,1941. From that round voyage the vessel’s gross revenue was $492,368.33 and her net profit, $298,546.98, equivalent to $6.36 per deadweight ton per month, before overhead, depreciation, and Federal income taxes.
From the remaining voyages of the Patricia Skakel, commencing in July 1941 and occupying about 384 days, average earnings amounting to $3.27 per deadweight ton per month, before overhead, depreciation and Federal income taxes, were realized by her owner. The average profit realized by her owner from the entire operation up to September 19, 1942, when defendant requisitioned title to the Patricia >Shakel, amounted to $4.25 per deadweight ton per month, before overhead, depreciation, and Federal income taxes.
15. A compilation prepared by certified public accountants from voyage reports submitted to the Maritime Commission by various shipping companies with respect to the earnings of American freighters built before 1935 and of 7,000 deadweight tons and over, on voyages terminating in the last quarter of 1941 or early 1942, show the following:
(a) Owned vessels operated by owner:
On 68 foreign overseas voyages, the average operating profit (before depreciation and overhead) amounted to $5.50 per deadweight ton per month. On 49 foreign nearby voyages, the average operating profit (before depreciation and overhead) was $3.55 per deadweight ton per month. On 55 domestic voyages, the average operating profit (before depreciation and overhead) was $2.64 per deadweight ton per month. The average operating profit (before depreciation and overhead) on all domestic and foreign voyages was $4.41 per deadweight ton per month.
(b) Owned vessels time chartered to others:
On 17 foreign overseas voyages, the owner’s average profit (before depreciation and overhead) was $4.44 per deadweight ton per month. On 2 foreign nearby voyages, the owner’s average profit (before depreciation and overhead) amounted to $4.73 per deadweight ton per month. There were no reports of domestic voyages in this class. The own *384 er’s average profit (before depreciation and overhead) on all foreign voyages was $4.45 per deadweight ton per month.
(c) Vessels bareboat chartered from others:
These vessels were all owned by the Maritime Commission. On 46 foreign overseas voyages, the charterers’ average direct operating profit before the payment of bareboat hire amounted to $4.88 per deadweight ton per month, and after the payment of bareboat hire averaging $2.21 per deadweight ton per month, the charterers’ average net profit was $2.67 per deadweight ton per month. There were no reports of foreign nearby voyages in this class, and onlv 1 domestic voyage.
The foregoing data reflected the results of voyages terminating in the last quarter of 1941 or early 1942, under charters or arrangements made prior to that time.
The foregoing data indicate that the Maritime Commission was, some time prior to the general requisitioning in April 1942, collecting bareboat hire at a rate in excess of the amount ($1.00 per deadweight ton per month) which the War Shipping Administration later proposed to include (see finding 24) in its computation of requisition time charter hire as “bareboat” compensation to owners of requisitioned freighters.
16. Until after the Ship Warrants Act became effective on July 14, 1941, time charter rates of $7.50 per deadweight ton per month were the prevailing rate. Such a rate would yield a “bareboat” return or equivalent of $5.61 per deadweight ton per month (after overhead but before depreciation and taxes) after deducting the actual average vessel and voyage expenses (plus overhead) of $1.89 per deadweight ton per month incurred by plaintiff’s vessels while engaged on 11 voyages under time charters during the period from February 2, 1941 to April 17,1942.
17. The evidence does not establish that the level of earnings realized by shipowners from the use of freighters such as the Hawaiian for the carriage of commercial cargo some months prior to the general requisitioning of all such privately owned vessels in April 1942 could reasonably have been realized by the plaintiff throughout the bareboat requisition period if the Hawaiian had not been requisitioned by *385 defendant, but bad remained in plaintiff’s possession and control.
Economic conditions of demand for and supply of shipping space, which had materially contributed to or brought about the level of earnings realized by shipowners in 1941 from the commercial employment of large, American-flag freighters such as the Hawaiian, throughout the bareboat requisition period remained favorable to a continuance of the potential level of earnings of such freighters from commercial employment at or above 1941 levels.
Other factors and circumstances which materially affected the level of earnings realizable from the commercial employment of large, American-flag freighters such as the Hawaiian came into being prior to the general requisitioning in April of 1942, on time charter basis, of all such privately owned vessels. On July 14, 1941, the Ship Warrants Act, 55 Stat. 591, was passed. (See finding 21.) After the passage of this Act, there was a substantial decline in the level of earnings realizable from the use of freighters such as the Hawaiian. Perhaps as importantly, from the standpoint of impact upon the earnings realizable from the commercial employment of all large, American-flag freighters, this country entered World War II on December 8,1941.
Thereafter, the level of earnings previously realizable from the employment of large, American-flag freighters such as the Hawaiian for the carriage of commercial cargo (see findings 7-16) no longer existed. Although the record does not establish with great particularity the full extent of restrictions nor the exact amount of reduction in earnings brought about by war conditions, it sufficiently appears from the record that a vessel would have been unable to operate under unrestricted free-market conditions during the bare-boat requistion period, not only because of legislative and administrative regulations, restrictions, and controls, but also by reason of historic circumstances and conditions arising from this country’s entry into the war.
Convoy protection, with its incident delays, was required in substantially all, if not all, trades. Priorities on steel for repairs and on scarce fuel oil were essential for continued operation of a vessel. It would have been impossible for a *386 privately owned ship to operate in a service geared to securing for its owner the highest revenues, and at the same time to obtain the necessary priorities and protection from the Government. Under all the facts and circumstances of record or of which the court may take judicial notice, the market value of the use of the Ha/waiian during the period prior to her requisition by the defendant on time charter basis in 1942 does not establish the fair and reasonable value of her use on bareboat basis throughout the period of defendant’s requisition of her use on such basis from July 7, 1943, to May 1, 1946.
18. After the Ship Warrants Act became effective and after the entry of this country into World War II, it became progressively impossible, because of war conditions and because of measures taken by the War Shipping Administration and the Maritime Commission pursuant to the Act, for American shippers to operate without acceptance of the Government’s schedule of rates, with the consequence that such rates came to be accepted by a substantial majority of such shippers.
19. The charter rates promulgated from time to time by the United States Maritime Commission and the War Shipping Administration in the course of administering the Ship Warrants Act of July 14, 1941, and the subsequent requisition programs were not market rates nor equivalent to probable fair market rates.
20. The so-called Ship Warrants Act of July 14, 1941, authorized the United States Maritime Commission and its successor, the Administrator, War Shipping Administration, to prescribe certain conditions to be complied with by such shipowners or charterers as might undertake to do so as a condition of obtaining a license called a “ship warrant” entitling their vessels to priority in “the use of facilities for loading, discharging, lighterage or storage of cargoes, the procurement of bunker fuel or coal, and the towing, overhauling, drydocking or repair of such vessels” in ports under jurisdiction of the United States. Among the conditions so authorized to be prescribed was an undertaking “with respect to * * * the fair and reasonable maximum rate of charter hire or equivalent.” The policy required to be followed by *387 the Commission in tbe administration of the Act was “to make fair and reasonable provision for priorities with respect to” the importation and transportation of substantial quantities of materials described in Section 4 of the Act.
The schedules of rates of charter hire and other conditions prescribed by the Maritime Commission or its successor from time to time, as hereinafter set forth, in the course of administering the Ship Warrants Act were incorporated in written “Uniform Conditions.” A ship warrant would not be issued to an applicant who did not undertake to observe such “Uniform Conditions.”
Although plaintiff did apply to the Commission on September 25, 1941, and on October 3, 1941, for ship warrants for its vessels, plaintiff did not incorporate in its application an undertaking to observe the “Uniform Conditions.” The Commission declined to issue warrants and returned the application to the plaintiff.
21. The measures taken by the United States Maritime Commission or its successor, War Shipping Administration, in the course of administering the Ship Warrants Act of July 14,1941, included the following:
(a) On July 30, 1941, in Press Release 970, the Commission issued “a scale of maximum time charter rates for United States and foreign flag vessels in which the Commission will concur for charters in which their concurrence is indicated on and after August 1,1941.”
Such scale provided for basic time charter hire at the rate of $4.50 per deadweight ton per month for steamships of 10,000 deadweight tons and up, with an additional 100 for each % knot of speed in excess of 12 knots. The basic rates for steamers of lesser deadweight tonnage were somewhat higher, the rate for a steamer of the Hawaiian's tonnage being $4.60 per deadweight ton per month. Such rates were admittedly about 35% below the then existing time charter rate of $7.50. Berth and other rates were to be adjusted on or before September 1,1941, to conform to time charter rates.
(b) The schedule of time charter rates contained in Press Release 970 formally became part of the ship warrants procedure by its incorporation into the “Uniform Conditions” *388 issued in connection with the “Ship Warrants Rules and Eegulations,” dated August 14, 1941, and approved by the President, August 26, 1941, to become effective thirty days thereafter.
(c) On January 5,1942, the Commission issued its Press Release 1117 making public the Commission’s General Order No. 49, dated December 30,1941, and to be effective January 20, 1942, reducing the maximum time charter rates which warrant-holding vessels were required to observe to levels about 28% below those in Press Release 970.
The new basic maximum time charter rate on steamers of 10,000 deadweight tons and up was $3.25 per deadweight ton per month, compared with the rate of $4.50 prescribed by Press Release 970. An additional 10$ per deadweight ton per month was allowed for each knot of speed in excess of 10 knots up to 14 knots. For steamers of the Hawaiian's tonnage, the new basic maximum rate was $3.35 per deadweight ton per month, as compared with the previous maximum of $4.60. After speed adjustments, the new rate for a steamer like the Hawaiian would have been $3.55, as compared with the previous maximum rate of $4.60 under Press Release 970.
(d) Berth rates and certain other rates charged by the operators of warrant-holding vessels were also required by General Order No. 49 and Press Release 1117 to be so adjusted as not to be “in excess of the charges for such service or arrangements in effect September 1,1940 * * * plus such reasonable additional surcharge as may be approved by the Commission” to cover increases in operating expense subsequent to September 1, 1940, and such requirement was incorporated into the ship warrant procedure by means of revised “Uniform Conditions” issued January 13, 1942.
Surcharges on berth rates were, in fact, authorized by “rate orders” of the War Shipping Administration issued throughout the period 1942-46 until the Warrant Act Regulations were revoked in 1946.
(e) In cooperation with the War Shipping Administration, the American Institute of Marine Underwriters and British Underwriters adopted a special provision called a “Ship Warrant Warranty,” to be inserted in ship hull in *389 surance policies issued on and after February 20,1942, making the holding of a ship warrant a condition of the validity of the insurance.
(f) After February 2, 1943, “nonwarrant holding vessels” were forbidden to use a “facility” without special authorization obtained by application to the War Shipping Administration. Such special authorizations were issued infrequently. The effect was to prohibit such vessels from obtaining repairs, fuel, stevedoring and towage in United States ports, even though the furnishing of such services would not interfere with service to a warrant holding vessel.
Before the “Ship Warrant Warranty” device was brought into operation and, later, all use of shore facilities was denied to vessels not holding warrants, the Warrants Act. had been ineffective to compel operators to obtain warrants merely because of the priority accorded to warrant-holding vessels in the use of shore facilities.
22. Prior to the general requisitioning in April 1942, many shipowners protested against the schedules of rates prescribed for warrant-holding vessels. There were few, if any, unqualified acceptances of the P. R. 1117 scale of rates. As a result, readjustments were allowed by the War Shipping Administration by means of “escalator clauses” and by giving the subsequent time charter requisition rates retroactive effect to January 20,1942.
23. Following the general requisition on time charter basis in April 1942, the War Shipping Administration on May 14, 1942, issued its General Order No. 8, establishing a scale of requisition time charter rates at amounts intermediate between those in the Maritime Commission’s Press Release 970 of July 30,1941, and those in the Commission’s Press Release 1117 effective January 20, 1942. The new scale was made retroactive to January 20, 1942.
Under the General Order 8 scale, steamers of 10,000 deadweight tons and up received time charter hire at $3.75 per deadweight ton per month on sailings prior to May 16,1942, and at $4 on sailings on and after May 16, 1942. Under Press Release 970 the basic rate for such vessels was $4.50 (see Finding 21a), whereas, under Press Release 1117, the rate was $3.25 (see Finding 21c).
*390 Steamers of the Hcmaiiari’s tonnage were allowed, under General Order 8, a basic rate of $3.90 on sailings prior to May 16th and $4.15 on later sailings.
24. Before issuing General Order No. 8 on May 14, 1942, the War Shipping Administration made an investigation of the average cost of operating various classes of vessels, including vessels built before 1937. In connection with its investigation the War Shipping Administration had requested and received from owners reports showing the financial results of some 597 voyages terminating for the most part in the last quarter of 1941, and in a few instances, in early 1942.
The War Shipping Administration approached the question of a requisition time charter rate scale from the standpoint of the sum of two components: (a) a so-called “bare-boat” factor of $1.00 per deadweight ton per month (with certain premiums for speed, refrigeration, and an “off-hire” allowance of 10%) ; and (b) a factor to represent the average of shipowners’ expenses under the proposed form of requisition time charter, together with an allowance for owner’s overhead.
(a) The “bareboat” factor of $1.00 per deadweight ton per month was not based upon any approximation of the earnings realized by shipowners from commercial employment of their vessels as shown by the voyage reports above mentioned, indicating such earnings from voyages terminating in the last quarter of 1941 or early 1942. The requisition time charter rates as contained in General Order No. 8 had no relation to the 1941 commercial earnings or the 1941 value of the use of requisitioned vessels. The former Director of Fiscal Affairs of the War Shipping Administration testified at a hearing in this case that “we got together a lot of information and we thought that the best way to fix the rate was to fix it on as low a basis as we possibly could. * * * We know that in 1941 the ships were earning quite a lot of money, and that the rates that were published in General Order No. 8 were nowhere near as high as the earnings the companies were making in 1941.”
(b) The expense factor was compiled from statistics on the average vessel expense, from voyages terminating in the *391 last quarter of 1941 or early 1942, for crew’s wages, subsistence of crew, stores, supplies, equipment, repairs, other vessel maintenance expense and insurance, with an allowance for owner’s overhead of $100 per day, which was later changed to $125 per day. The resulting figures were adjusted to take into account certain known or anticipated increases in costs and for periods of “off-hire.”
The principal study of actual vessel expense related to 60 voyages terminating in the last quarter of 1941 by freighters over 20 years old and having from 8,000 to 8,999 tons deadweight capacity, as this was the largest number of voyages in any one class.
To determine the rates applicable to vessels in tonnage classes below and above the 8,000 to 8,999-ton class, additions or subtractions were made to adjust for assumed differences in average vessel operating costs on a deadweight ton basis.
The vessel expenses and overhead shown by the studies fluctuated so widely and would, therefore, cause such wide variations in compensation to owners under a time form operation that the Director of Fiscal Affairs recommended that the War Shipping Administration substitute a bare-boat basis of operation. This recommendation was not followed at that time, however, but was in 1943.
25. Prior to the issuance of General Order No. 8 on May 14, 1942, the question of requisition time charter rates was discussed at a meeting held May 9-11, 1942, between representatives of the War Shipping Administration and a Group of officials (for convenience, hereinafter called the “owner group”) representing a number of shipping companies. Among those in attendance were representatives of seven companies holding operating differential subsidy contracts with the Maritime Commission, and of two companies which were subsidiaries of steel companies. Plaintiff was represented at this meeting.
At the meeting, representatives of the War Shipping Administration started discussions with the owner group on the basis of a “bareboat” component of $1.00 per deadweight ton per month. The owner group was given to understand by the Director of Fiscal Affairs that if there was not general *392 acceptance of “a rate that I thought was low enough,” he would recommend requisition of title to their vessels.
The owner group declined to discuss rates composed of stated component parts, and the rate finally arrived at was understood to be an “overall rate.” However, owner’s costs under time charter form of operation of freighters in the 8,000 to 8,999-ton class were discussed between a subcommittee of the owner group and the Comptroller of the War Shipping Administration and various adjustments were made (see finding 24) to an'ive at a total proposed rate of $4.10 per deadweight ton per month for freighters in the 8,000 to 8,999-ton class on sailings after May 16, 1942.
Finally, after some of the owner group had indicated that they would recommend acceptance if 25 cents per deadweight ton per month were added to bring the rate as a whole to $4.35, the rate was increased to $4.35. The evidence does not furnish any clear explanation as to the calculation of the rates of hire applying to vessels having tonnages greater or less than those in the 8,000 to 8,999-ton group, but the rate applicable to vessels of the Hawaiian’s tonnage on sailings after May 16,1942, was $4.15. On account of the HawoAiamis speed (in excess of 12 knots), she was entitled to $4.35.
It does not appear from the evidence that plaintiff’s representatives were included in that portion of the owner group which had agreed to recommend acceptance if the 25 cents were added to the $4.10 rate. One of plaintiff’s officials in attendance stated to the meeting that he was reasonably sure plaintiff would not accept. The time charter rates promulgated in General Order No. 8 were ultimately accepted by plaintiff.
26. The evidence in the record establishes that 79 owners of 390 vessels accepted defendant’s time charter rates, including plaintiff.
As stated in the preceding finding, the owner group was advised at the May 1942 meeting that if there were not general acceptance of “a rate that I thought was low enough,” the Director of Fiscal Affairs would recommend requisition of title to their vessels. One of the owner group present at the meeting declined to accept the time charter rates, and his vessels were later requisitioned for title. Under *393 these circumstances, practical considerations with regard to the shipowner’s organization and post-requisition prospects weighed in favor of acceptance of the time charter rates.
Some shipowners had incurred expenses from operating vessels on requisition status or on unexecuted time charter status from dates as far back as January 1942. Acceptance of the time charter rates promulgated in General Order No. 8, or, in the alternative, acceptance of 75 per cent of “just compensation” as determined by the War Shipping Administration with the right to have the amount of just compensation judicially determined, was necessary in order to obtain reimbursement for these expenses. In plaintiff’s case, such unreimbursed outlays amounted to about $2,000,000 at the time when the requisition time charter rates were tendered for acceptance.
Time charters were not accepted by all affected owners, and the evidence establishes that many of the charters which were accepted were accepted at a much later date, in connection with settlements by transfer of title or otherwise.
27. In November 1942, a dispute occurred between the Comptroller General of the United States and the Administrator, War Shipping Administration, regarding the application of the so-called “enhancement clause” of Section 902 (a) of the Merchant Marine Act, 1936, to the determination of just compensation for requisitioned vessels. The Comptroller General ruled that the “enhancement clause” prohibited the payment of compensation for vessels to the extent that it might be based upon values in excess of the values existing on September 8, 1939, provided such excess be determined as due to economic conditions directly caused by the national emergency. As a result of a notice issued December 17, 1942, the Administrator commenced to withhold 25% of the hire payable under the terms of the requisition time charters. Thereafter, the Hawaivm was requisitioned on bareboat basis (See Finding No. 1), and similar requisitions of plaintiff’s other vessels followed.
On October 15,1943, the President appointed an Advisory Board on Just Compensation, which on December 7, 1943, rendered a report of its views on the principles which should *394 be followed by the Administrator in determining just compensation.
Meanwhile, by notices dated October 15, 1943, November 1.1943, and November 24,1943, the Administrator instituted a “Kevised Program of Ship Requisition, Charter and Operation,” which, in effect, provided for termination of the requisition time charters then remaining in force and for a general requisition on bareboat basis. Exception was made for cases where owners might elect to remain on time charter basis but with a revised form of charter and at revised rates.
Thereafter, the compensation offered by the ¡War Shipping Administration for the use of vessels requisitioned on bare-boat basis was fixed by General Order No. 37, issued on April 7.1944.
28. General Order No. 37 was prepared by the Division of Large Vessel Procurement of the War Shipping Administration under the supervision of the Assistant Deputy Administrator for Fiscal Affairs. The basic rate of bare-boat charter hire provided by General Order No. 37 for all dry cargo vessels built during the period 1914-34 was $1.25 per deadweight ton per month.
In a memorandum, submitted on April 15, 1944, to the House Committee on the Merchant Marine and Fisheries, the Administrator, War Shipping Administration, stated that “the proposed basic rates of General Order No. 37 are:
(1) below actual earnings of 1940 and not greatly in excess of earnings of 1939;
(2) only about 40 percent of the rate recently fixed by the court in the Olson case;
(3) only about 40 percent of the bareboat rates paid by the Army and Navy in 1941;
(4) less than one-third of the rate fixed administratively in the first [world] war;
(5) about one-third of the actual earnings of 1941;
(6) about one-fifth of the rates allowed by the courts in the first [world] war .; and
(7) less than the average bareboat rates charged by the Maritime Commission in 1940 and 1941.”
The principal preliminary findings in connection with determination of the rate of bareboat charter hire for freighters built prior to 1935 were that the market value of their *395 bareboat use could not be determined by sufficient hirings made at or about the time of taking, and that the value of the use should be determined in accordance with Rule 3 of the Advisory Board on Just Compensation, which provided as follows:
Where market value cannot be determined by sufficient sales, or hirings of vessels of like character, made at or about the time of taking, it is to be determined by the Administrator from a consideration of cost of construction, acquisition cost so far as relevant, improvements, replacement costs, depreciation, earnings, physical condition, appraisals for insurance or other purposes, and any other relevant facts upon which a reasonable judgment as to value can be based. These various matters are to be given such weight by the Administrator, as in his opinion they are justly entitled to, in determining the price that would probably result from fair negotiations between an owner willing to sell and a purchaser desiring to buy.
The method used by the War Shipping Administration was to give predominant consideration to two “factors”, each of which, it was found, showed that an amount of about $1.25 per deadweight ton per month would constitute just compensation for bareboat use. The two “factors” were:
(a) The average amount of “adjusted earnings under current charters,” (i. e., under the requisition time charters) and, alternatively;
(b) A sum sufficient to provide for (1) annual “depreciation” on the valuation of the vessels, and (2) a “reasonable rate of return” on such valuation.
Further facts regarding these two alternative factors and the subsidiary findings of the War Shipping Administration in connection with those factors are stated in findings 29, 30, and 31.
29. In connection with the first factor, it was found that the “adjusted earnings” of the average dry cargo vessel built prior to 1935 had amounted to $1,275 per deadweight ton per month under the requisition time charters.
The procedure of using as a factor in determining just compensation for use under the bareboat requisitions the average “adjusted earnings” under the scale of rates fixed *396 by the War Shipping Administration in connection with its prior requisition on time charter basis was explained on the ground that the requisition time charters were the only “hirings” immediately before the general requisitioning on bareboat basis.
Some consideration but no effect was given to the earnings which requisitioned vessels had realized for their owners prior to defendant’s taking of the vessels in April 1942, the reasons given being, in substance, that such earnings were considered to be no longer available to private shipowners, and that time charter rates had been decreasing for some time prior to the general requisitioning on time charter basis in April 1942.
Earnings then being realized by defendant on particular voyages from the employment of requisitioned vessels for the carriage of commercial cargo were not taken into account by the War Shipping Administration in determining just compensation for the use on bareboat basis of requisitioned vessels. Vessels requisitioned by the War Shipping Administration were used for the carriage of military, lend-lease, and commercial cargoes. The evidence does not establish that it was possible for the War Shipping Administration to segregate the results of voyages in which requisitioned vessels were used for the transportation of commercial cargo, as distinguished from voyages in which military or lend-lease cargoes, or combinations of types of cargoes, were carried. The primary consideration in the employment of requisitioned vessels by the War Shipping Administration was the effective utilization of such vessels as a pool of shipping in the interests of furthering the war effort. Vessels were necessarily used uneconomically in many instances, while in other instances vessels were placed in trades where there was an opportunity for profit. The evidence does not establish that earnings realized on particular voyages by defendant from the employment of requisitioned vessels for the carriage of commercial cargo bear any reasonable relationship to just compensation for the use on bareboat basis of requisitioned vessels.
The statement of “adjusted earnings” of the average dry cargo vessel built prior to 1935 consisted in part of deduc *397 tions of estimated amounts for “deferred repairs”, “allowance for risks”, and “overhead”, which defendant’s witness on the subject was unable to substantiate and which are not shown to have any material application to the Hawaiian.
A comparison of the actual audited figures of the plaintiff and of States Marine Corporation for all their operations under the requisition time charters, and the War Shipping Administration figures shows the following result:

Comparison of W. S. A. estimate of “adjusted earnings” under requisition time charters with actual earnings of plaintiff and of States Marine Corporation

íV. S. A. estímale Items {lief. Ex. 19B) States Plaintiff Marine (PI. Ex. (PI. Ex. SS) 7S)

1. Actual charter hire_ $4. 098
2. Allowance for accrued off hire_ . 066
3. Adjusted charter hire_ 4. 032 $3. 96 $4. 30
4. Reported operating costs_$1. 882
5. Allowance for deferred repairs . 215
6. Allowance for risks___ . 250
7. Adjusted operating costs_ 2. 347 1. 89 *1. 93
8. Adjusted earnings before overhead. 1. 685 2. 07 2. 37
9. Allowance for overhead_ . 41 **. 17 †0
10. Adjusted earnings_ 1. 275 1. 90 #2. 37
30. In connection with the second alternative “factor” claimed to support the rate of $1.25, three subsidiary “findings” were made by the War Shipping Administration staff:
(a) That the average valuation of requisitioned dry-cargo freighters built prior to 1935 amounted to $75 per deadweight ton as of April 1942 when the general requisitioning on time charter basis had occurred;
(b) That the average anticipated remaining life of such vessels after April 1942 was eight years and their consequent annual rate of “depreciation” was. 1214%.
(c) That annual hire at the rate of $15 per deadweight ton (equivalent to $1.25 per deadweight ton per *398 month), would provide both: (i) “a reasonable rate of return” of $5,625, representing 10% of $56.25, the. average depreciated valuation of the vessels per deadweight ton as of April 1944; and also, (ii) $9,375, representing the amount of annual depreciation on the average value of $75 (as of April 1942), at the annual rate of 12%%.
(a) With regard to the subsidiary findings that requisitioned freighters built prior to 1935 all had a value of $75 per deadweight ton in April 1942 and that the depreciated value of such freighters in April 1944 was $56.25 per deadweight ton, “the most reliable measure of evaluation” was, in the opinion of the War Shipping Administration, “the value as of the date of general requisitioning in April 1942, depreciated to the date of said determination.”
No factual justification appeared for lumping all such vessels together and assigning them the same valuation. On the contrary, the Administration’s Division of Statistics and Eesearch found, in respect of the sales and appraisal data studied covering dry cargo vessels of 7,000 to 12,000 tons deadweight, that:
Any trends or central tendencies noted in this study are qualified by the fact that the number of dry cargo vessels and tankers under consideration is small, probably too small for statistical analysis. Furthermore, vessels of the size included here are quite individualistic in character and would show a high degree of dispersion from any median or average. The best that the data have to offer are some suggestions and tentative conclusions.
Eight “elements” were stated to have been considered in arriving at the April 1942 valuation finding. Of these, two “elements” relating to depreciated construction cost were given little weight. The significance of an “element” consisting of two private sales occurring in January and February 1941, and another “element” consisting of a “peak sale,” also in 1941, was unexplained. Little, if any, weight was given to the “element” of average sales in 1941 from the Government’s laid-up fleet. The “element” of appraisal data showing values of $76 in 1942 and $70 in 1943 consisted of some 18 appraisals in March, April, and May 1942, of which *399 15 were by the Maritime Commission, and three private appraisals in 1943.
The final “element” consisted of “values under current charters,” which were found to be from $70 to $75 per deadweight ton. This figure was the valuation which the assumed average vessel would have under the scale fixed by the War Shipping Administration in General Order No. 9 for purposes of war risk insurance under the requisition time charters. After a consideration and weighing of all of the above “elements”, the figure adopted by the War Shipping Administration was a valuation of $75 per deadweight ton.
(b) The second subsidiary finding above mentioned was that because of assumed obsolescence, such vessels had a useful remaining life of eight years and a consequent annual “depreciation” of 12y2 per cent commencing in April 1942. “Depreciation” was not used in the usual accounting sense but as a measure of a wasting asset approaching the end of its useful life, because of the judgment of the War Shipping Administration that subsequent to the war and immediate post-war periods old vessels would be unable to compete commercially with newer vessels, and that the value of old vessels, except for scrap purposes, would probably be exhausted during the anticipated war and immediate post-war periods.
(c) The third subsidiary finding, that a 10 per cent rate of return on the War Shipping Administration’s valuation of the vessels as of April 1944 was a “reasonable rate of return,” was based upon the exercise of the judgment of the War Shipping Administration’s staff. It was founded, in part, upon the “personal judgment as a business man” of the Assistant Deputy Administrator for Fiscal Affairs, and in part upon the judgment of the War Shipping Administration’s staff “of what public opinion would consider a reasonable rate of return.”
31. It is not possible to conclude from the evidence that the rate of $1.25 per deadweight ton per month was the rate which would probably result from fair negotiations between an owner willing to let and a charterer willing to hire the Hawaiian on or about July 7, 1943, or at any other time during her requisition period.
*400 32. The fair and reasonable valúe of the use of the Hawaiian, during the period of bareboat requisition is not capable of measurement with mathematical exactness. From a consideration and evaluation of all of the relevant facts and circumstances of record or of which the court may take judicial notice, including, but not limited to, the general characteristics of the Hawaiian, her physical condition, her age, the level of earnings realized by owners from the use of vessels both prior to requisition and under requisition time charter, the demand for and supply of shipping space, the legislative and administrative restrictions to which vessels were subject, and considering the uncertainties caused by this country’s participation in World War II, it is found that a bareboat rate of $2.50 per deadweight ton per month during the bareboat requisition period constitutes just compensation for the use of the Hawaiian, which does not include any enhancement caused (1) by the Government’s need of vessels which necessitated the taking, (2) by the previous taking of vessels of similar types, or (3) by a prospective taking reasonably probable.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover.
The entry of judgment is suspended until the incoming of a stipulation by the parties, or, in the absence thereof, until the incoming of a report of a Commissioner showing the amount due plaintiff, computed in accordance with this opinion.

 Apparently plaintiff’s overhead continued even after requisition on a time charter basis.

Includes $45,343.71 of disputed items of expense equivalent to $0.09 per deadweight ton, per month.

At $60 per day, being the husbanding fee allowed by the W. S. A. to General Agents.

[Husbanding expense is included in operating costs. (MoOrath, p. 1898.)

 The actual figure in Plaintiff’s Exhibit 73 is $2.40. The figure of $2.37 appearing in the above table is derived from use of months of 30 days each for convenience in calculating the number of “deadweight ton months.”